# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

DENIS BYRNE, SR., *as Administrator of the*
*Estate of DENIS N. BYRNE, JR.,*

                                        *Plaintiff,*

        *-against-*

JUUL LABS, INC., formerly d/b/a PAX Labs,
Inc. and PLOOM, Inc.; ALTRIA GROUP,
INC.; PHILIP MORRIS USA, INC.; ALTRIA
CLIENT SERVICES LLC; ALTRIA GROUP
DISTRIBUTION COMPANY; ALTRIA
ENTERPRISES LLC; MOTHER MURPHY'S
LABORATORIES, INC.; ALTERNATIVE
INGREDIENTS, INC.; TOBACCO
TECHNOLOGY, INC.; ELIQUITECH, INC.;
MCLANE COMPANY, INC.; EBY-BROWN
COMPANY, LLC; CORE-MARK HOLDING
COMPANY, INC.; BELLA DELI MARKET
CORP., d/b/a BELLA DELI MARKET, and
TAG DELI GROCERY STORE CORP d/b/a
TAG SMOKE SHOP,

                                        *Defendants.*

Index No.:
Date Index No. Purchased:

*DENIS N. BYRNE, SR. designates as the place*
*of trial:*

**BRONX COUNTY**

The basis of venue is:
  *DENIS N. BYRNE, SR. resides in this county, and a*
  *substantial part of the events giving rise to the claim*
  *occurred in this county*

**Summons**

**To the above-named Defendant(s):**

        **You are hereby summoned** to answer the Complaint in this action and to serve a copy of your

Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on

DENIS N. BYRNE, SR.'s Attorney(s) within twenty (20) days after the service of this Summons,

exclusive of the day of service (or within 30 days after the service is complete if this Summons is not

personally delivered to you within the State of New York); and in case of your failure to Appear or

Answer, Judgment will be taken against you by default for the relief demanded in the Complaint.

Dated:   New York, New York
         September 28, 2021

Respectfully Submitted,

_____

THOMAS P. VALET

RAPPAPORT, GLASS, LEVINE & ZULLO LLP

**Attorneys for DENIS N. BYRNE, SR.**

1355 Motor Parkway

Islandia, NY 11749

(631) 293-2300

TValet@Rapplaw.com

**Attorneys for DENIS N. BYRNE, JR.**

**Defendants' Service Addresses:**

| | |
|---|---|
| **BELLA DELI MARKET CORP d/b/a BELLA DELI MARKET** 4011 E. Tremont Street, Bronx, New York | **TAG DELI GROCERY STORE CORP d/b/a TAG SMOKE SHOP GROCERY** 1905 Williamsbridge Rd., Bronx, New York |
| **JUUL LABS, INC., formerly d/b/a PAX Labs, Inc. and PLOOM, Inc.** 560 20th Street, San Francisco, CA 94107 | **ALTRIA GROUP, INC.** 601 W Broad St, Richmond, VA 23230 |
| | **ALTRIA CLIENT SERVICES LLC** 601 W Broad St, Richmond, VA 23230 |
| **PHILIP MORRIS USA, INC.** 601 W Broad St, Richmond, VA 23230 | **ALTRIA ENTERPRISES LLC** 601 W Broad St, Richmond, VA 23230 |
| **ALTRIA GROUP DISTRIBUTION COMPANY** 601 W Broad St, Richmond, VA 23230 | **ALTERNATIVE INGREDIENTS, INC.** 2826 South Elm-Eugene Street, Greensboro, NC 27406 |
| **MOTHER MURPHY'S LABORATORIES, INC.** 2826 South Elm-Eugene Street, Greensboro, NC 27406 | **ELIQUITECH, INC.** 600 Liberty Rd., Eldersburg, MD 21784 |
| **TOBACCO TECHNOLOGY, INC.** 600 Liberty Rd., Eldersburg, MD 21784 | **EBY-BROWN COMPANY, LLC** 1415 W. Diehl Road, Suite 300N, Naperville, IL 60563 |
| **MCLANE COMPANY, INC.** 1999 Bryan St., Ste. 900, Dallas, TX 75201 | **CORE-MARK HOLDING COMPANY, INC.** 1500 Solana Blvd. Suite 3400, Westlake, TX 76262 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

DENIS BYRNE, SR., *as Administrator of the*
*Estate of DENIS N. BYRNE, JR.,*                                    Index No.

                              *Plaintiff,*

                                          **VERIFIED COMPLAINT**

     *-against-*                                          **JURY TRIAL DEMANDED**

JUUL LABS, INC., formerly d/b/a PAX Labs,
Inc. and PLOOM, Inc.; ALTRIA GROUP, INC.;
PHILIP MORRIS USA, INC.; ALTRIA
CLIENT SERVICES LLC; ALTRIA GROUP
DISTRIBUTION COMPANY; ALTRIA
ENTERPRISES LLC; MOTHER MURPHY'S
LABORATORIES, INC.; ALTERNATIVE
INGREDIENTS, INC.; TOBACCO
TECHNOLOGY, INC.; ELIQUITECH, INC.;
MCLANE COMPANY, INC.; EBY-BROWN
COMPANY, LLC; CORE-MARK HOLDING
COMPANY, INC.; BELLA DELI MARKET
CORP., d/b/a BELLA DELI MARKET, and
TAG DELI GROCERY STORE CORP d/b/a
TAG SMOKE SHOP,

                              *Defendants.*

---

        Plaintiff, DENIS N. BYRNE, SR., as Administrator of the Estate of DENIS N. BYRNE,

JR., by and through his undersigned counsel, RAPPAPORT, GLASS, LEVINE & ZULLO LLP,

brings this Verified Complaint in the above-entitled action against the defendants herein,

respectfully shows to this Court, and alleges upon information and belief, the following:

        1.      DENIS N. BYRNE, JR., died on October 4, 2019, of a lung disease that he

developed as a result of his use of vaping products manufactured, distributed and sold by the

Defendants.    At the time of his death, DENIS N. BYRNE, JR., was 17 years old.

2.      Prior to the commencement of this action, Plaintiff DENIS N. BYRNE, SR., was duly appointed the Administrator of the Estate of his son, DENIS N. BYRNE, JR., pursuant to an Order of the Surrogate's Court, County of Bronx., State of New York, dated September 1, 2021. A copy of the Letters of Administration is annexed hereto.

## I.    NATURE OF THE CASE

3.      Defendants were involved in the design, manufacture, assembly, inspection, testing packaging, labeling, marketing, advertising, promotion, supply, distribution, and sale of JUUL products, and intentionally targeted adolescents in their marketing campaigns and through the production of flavored JUULpods that concealed the nicotine content contained in the JUULpods.

4.      These Defendants' efforts to addict a new generation of teenagers and young adults to nicotine and vaping and their wrongful conduct in marketing, promoting, manufacturing, designing, and selling JUUL substantially caused and contributed to DENIS N. BYRNE, JR.'s injuries and death.

5.      In 2015, JUUL set out to recapture the magic of the most successful product ever made—the cigarette.   Due to regulations and court orders preventing the major cigarette manufacturers from marketing to young people, youth smoking had decreased to its lowest levels in decades.   While the public health community celebrated this decline as a victory, JUUL saw an opportunity.   Seizing on regulatory inaction and loopholes for e-cigarettes, JUUL set out to develop and market a highly addictive product that could be packaged and sold to young people. Youth is and has always been the most sought-after market for cigarette companies because they are the most vulnerable to nicotine addiction and are most likely to become customers for life.

6.      JUUL was designed perfectly for teenagers and young adults.   It doesn't look or smell like a cigarette.   It is a sleek, high-tech youth-friendly battery-powered device that looks like a USB drive.   The JUUL device heats a nicotine filled liquid JUULpod, sold separately in fun

flavors like mango and cool mint, delivering powerfully potent doses of nicotine, along with aerosol and other toxic chemicals into the lungs, body and brain. Unlike noxious cigarette smoke, when a JUUL user exhales, the smoke is undetectable. JUUL is small, easily concealable and can be used practically anywhere without parents or teachers knowing. Googling "hiding JUUL in school" or "how to ghost rip JUUL" returns hundreds of videos on how to JUUL anywhere without detection. This is part of the appeal, fostered and bolstered by JUUL's viral marketing campaigns using young models to make the products look cool and stylish.

7.    JUUL was designed to addict young people to vaping. Nicotine is one of the most addictive chemicals in the world. By studying cigarette industry archives, JLI learned how to manipulate the nicotine in its products to maximize addictiveness. JLI designed its products to have maximum inhalability, without any "throat hit" or irritation that would serve as a natural deterrent to new users. JLI designed its device to deliver substantially higher concentrations of nicotine per puff than traditional cigarettes and most other e-cigarettes. This combination of ease of inhalation and high nicotine delivery makes JUUL both powerfully addictive and dangerous.

8.    Defendants involved in the design, manufacture, assembly, inspection, testing packaging, labeling, marketing, advertising, promotion, supply, distribution, and sale of JUUL products knew that JUUL's e-cigarettes and pods were not safe under any circumstances for minors and non-smokers. These Defendants hid that: (a) a JUULpod effectively delivers more nicotine than a packet of cigarettes; (b) JUULpods contain a special formulation of nicotine salts and benzoic acid specifically designed to deliver an otherwise intolerable level of nicotine while still maintaining a smooth smoking experience; (c) the amount and manner of nicotine provided in JUULpods was highly addictive; and (d) the numerous additional deleterious health consequences associated with vaping.

9.    Defendants involved in the design, manufacture, assembly, inspection, testing packaging, labeling, marketing, advertising, promotion, supply, distribution, and sale of JUUL products were under a duty to disclose this material safety information based upon their exclusive

knowledge and concealment which was never disclosed to DENIS N. BYRNE, JR. or the public at any time or place or in any manner.

10. Nicotine is dangerous, particularly to young people whose brains are still developing. Nicotine is not only addictive, but also permanently alters the structure of the brain and causes permanent mood changes and other cognitive disorders.

11. Nicotine addiction causes repeated exposure to the toxins and aerosols contained in JUUL's vapor.

12. Several studies, including one recently released by the American Stroke Association, have shown that e-cigarettes increase the risk of stroke, heart attack and coronary artery disease.[1]

13. Other studies have shown that e-cigarettes containing nicotine significantly increase blood pressure, heart rate and arterial stiffness, and also cause vascular damage, which can lead to strokes and other cardiovascular injuries.

14. These studies build on the well-established research that nicotine increases blood pressure.

15. Defendants were also aware that use of JUUL products was a precipitating factor and led to vaping of THC products by minors who used JUUL to vape THC.

16. At the time DENIS N. BYRNE, JR. starting using JUUL in 2017, none of JUUL's advertising, marketing, promotion, packaging, or website disclosed the health effects and risks that Defendants knew or should have known would occur from use of its products and vaping. Instead, the imaging, advertising, promotion, packaging, and overall marketing represented the product as safe, fun, and not harmful and a safer alternative to cigarettes.

17. Since 2015 when JUUL hit the market, JUUL became pervasive in schools across the country and adolescent and young adult use became rampant. JUUL not only dominated the

---

1 *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries* (Jan. 30, 2019) American Stroke Association *News Release,* Abstract 9, Session A2,
https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries (as of December 9, 2019).

multi-billion dollar e-cigarette market, but expanded the size of that market significantly—mostly via young non-smokers. The cigarette company Defendant Altria acquired a 35% stake in JUUL for $12.8 billion, giving Defendant Altria access to the new generation of customers JUUL has groomed and capturing its former cigarette smokers who were leaving the conventional cigarette market for the promise of e-cigarettes and vaping being a safer alternative.

18.    JUUL created an epidemic. According to Alex Azar, the Secretary of the U.S. Department of Health and Human Services, "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising." [2] The conduct of Defendants involved in the design, manufacture, assembly, inspection, testing packaging, labeling, marketing, advertising, promotion, supply, distribution, and sale of JUUL products led to a surge in teen e-cigarette use, creating the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S." [3] In a mere two years, these Defendants undid more than a decade of progress in reducing teen smoking, thereby increasing nicotine use among teenagers to levels not seen since the early 2000s. DENIS N. BYRNE, JR. was a target and a victim of JUUL's conduct.

19.    As a result of Defendants' conduct, DENIS N. BYRNE, JR. became addicted to JUUL and vaping, and suffered life-altering personal injuries which ultimately caused his death, for which his estate representative seeks all appropriate remedies and relief.

## II.    JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to CPLR §301 because DENIS N. BYRNE, SR. resides in the State of New York; prior to his death DENNIS N. BYRNE, JR., resided in the State of New York; one or more of the Defendants resides in or has its principal

---

2 *Surgeon General releases advisory on E-cigarette epidemic among youth*, U.S. Department of Health & Human Services (Dec 18, 2018),
www.hhs.gov/about/news/2018/12/18/surgeon-general-releases-advisory-e-cigarette-epidemic-among-yo uth.html (as of December 9, 2019).

3 Salynn Boyles, *Surgeon General Calls for New E-Cig Restrictions: 'I am officially declaring e-cigarette use among youth an epidemic* (Dec 28, 2018),
https://www.medpagetoday.com/primarycare/smoking/77000 (as of December 9, 2019).

place of business in the State of New York; and/or one or more of the Defendants conducts substantial business within the State of New York.

21.     Alternatively, this Court has jurisdiction pursuant to CPLR §302 because a substantial part of the tortious acts alleged herein took place within the State of New York, County of Bronx

22.     Venue for this action is proper in this Court under CPLR §503(a) in that Plaintiff DENIS N. BYRNE, SR., resides in the County of the Bronx, and a substantial part of the events giving rise to this claim occurred in the County of the Bronx.

## III.   THE PARTIES

### A. Plaintiff

21.     DENIS N. BYRNE, JR. was born in the year 2001.  He died on October 4, 2019. At the time of his death, DENIS N. BYRNE, JR., was 17 years old, and resided with his parents in the Bronx, New York.

22.     Plaintiff DENIS N. BYRNE, SR., is, and at all relevant times was a resident and citizen of New York, County of the Bronx.

23.     DENIS N. BYRNE, JR., prior to his death, purchased and consumed JUUL products in the State of New York, including JUUL devices and JUULpods, until suffering electronic cigarette (vaping) product use associated lung injury ("EVALI") requiring hospitalization in August, 2019.

24.     DENIS N. BYRNE, JR. first started vaping after purchasing JUUL products in 2017, when he was 15 years old.  Thereafter, he used JUUL products and vaped on a daily basis, multiple times per day.  DENIS N. BYRNE, JR.'s peers also frequently used Juul at that time.

25.     DENIS N. BYRNE, JR. developed a severe nicotine addiction and suffered from symptoms of addiction, including anxiety and panic attacks if he was without a Juul device.

26.     DENIS N. BYRNE, JR. became highly addicted to nicotine as a result of his use of JUUL and as a consequence, used and became addicted to the use of e-cigarettes and vaping.

27.     Beginning in 2017 and up to the time of his death in 2019, DENIS N. BYRNE, JR. purchased JUUL products and other vaping products on numerous occasions from the retail store owned and operated by the Defendant BELLA DELI MARKET CORP., at 4011 E. Tremont Street, Bronx, New York.

28.     Beginning in 2017 and up to the time of his death in 2019, DENIS N. BYRNE, JR. purchased JUUL products and other vaping products on numerous occasions from the retail store owned and operated by the Defendant TAG DELI GROCERY STORE CORP., d/b/a TAG SMOKE SHOP GROCERY, at 1905 Williamsbridge Rd., Bronx, New York.

29.     DENIS N. BYRNE, JR. had been using Juul and vaping for several years, when in August 2019, he developed symptoms of headache and shortness of breath. He presented to Albert Einstein Medical Center in the Bronx. He was examined and discharged, but later that same month, he again presented to Einstein Hospital with severe shortness of breath. He was transferred to Montefiore Medical Center in the Bronx, New York, and admitted to the ICU for 10 days. He was diagnosed and treated with a presumptive diagnosis of pneumonia.

30.     In September 2019, DENIS N. BYRNE, JR., collapsed. He was again hospitalized and was diagnosed with a severe lung injury related to vaping. He was diagnosed with EVALI and died on October 4, 2019.

31.     An Autopsy was performed on DENIS N. BYRNE, JR. The Medical Examiner concluded that he died from Electronic Cigarette (Vaping) Product Use-Associated Lung Injury (EVALI) and that his lungs showed evidence of severe pulmonary damage.

32.     DENIS N. BYRNE, JR. was unaware that use of Juul and vaping could cause severe lung injuries resulting in trauma, pulmonary problems, and other injuries. Moreover, DENIS N. BYRNE, JR. was unaware how much nicotine a JUUL pod contained or delivered, or that Juul had specifically been developed to maximize the addictive potential of nicotine.

33.     As a result of his use of Juul, DENIS N. BYRNE, JR. suffered from nicotine addiction, vaping-induced lung injury and hypoxia that ultimately caused his death

34.     DENIS N. BYRNE, JR.'s severe respiratory injuries, nicotine addiction and the effects thereof from Juul permanently injured and altered his brain and respiratory system prior to his death. Additionally, DENIS N. BYRNE, JR. suffered harm from vaping through exposure to toxic substances contained within JUUL products, which caused or contributed to his development of pulmonary disease which caused his death.

35.     The use of JUUL was a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death.

**B.     The JUUL Defendants**

36.     Defendant JUUL LABS, INC. ("JLI") is a Delaware corporation, with its principal place of business in San Francisco, California. JLI originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JLI formerly known as PAX Labs, Inc., formerly known as Ploom, Inc., was incorporated in Delaware on March 12, 2007 (under the name Ploom, Inc.) and has its principal place of business in San Francisco, California.

37.     JLI, designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarettes devices, JUUL Pods and accessories (collectively "JUUL"). Prior to the formation of separate entities PAX Labs, Inc. and JLI in or around April 2017, JLI designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc. References to JLI includes its predecessors, PAX Labs, Inc. and Ploom, Inc.

38.     At all relevant times, JLI ratified each and every act or omission alleged herein in proximately causing the injuries and damages alleged herein.

39.     Defendant ALTRIA GROUP, INC., (AGI") is a Virginia corporation, with its principal place of business in Richmond, Virginia. AGI is one of the world's largest producers and marketers of tobacco products, manufacturing and selling "traditional" cigarettes for more than a century. On December 20, 2018, AGI purchased a 35% stake in JLI. ALTRIA and JLI executed a

Services Agreement that provides that AGI through its subsidiaries, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.

40. Defendant PHILIP MORRIS USA, INC. ("Philip Morris"), is a wholly-owned subsidiary of AGI. Philip Morris is a Virginia corporation with its principal place of business in Richmond, Virginia. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years. Philip Morris performs direct marketing support services for JLI under the Services Agreement to assist JLI in selling, marketing and promoting JUUL. This has included, among other things, placing JUUL Product inserts in millions of packs of L&M, Parliament, and Marlboro cigarettes and utilizing Philip Morris's extensive consumer market database for targeted direct marketing purposes.

41. Defendant ALTRIA CLIENT SERVICES LLC ("ACS") is a wholly-owned subsidiary of AGI. ACS is a Virginia limited liability company with its principal place of business in Richmond, Virginia. ACS and JLI have executed several Statements of Work whereby ACS performs services under the Services Agreement to assist JLI in the sale, marketing, promotion and distribution of JUUL. Such services include database support, direct marketing support, and premarket product application support.

42. Defendant ALTRIA GROUP DISTRIBUTION COMPANY ("AGDC") is a wholly-owned subsidiary of AGI. AGDC is a Virginia corporation with its principal place of business in Richmond, Virginia. AGDC and JLI have executed several Statements of Work whereby AGDC performs services under the Services Agreement to assist JLI in the sale, marketing, promotion and distribution of JUUL. Such services include JUUL-distribution support, the removal by AGDC of Nu Mark products (such as Green Smoke or MarkTen) and fixtures in retail stores and replacing them with JLI products and fixtures, and sales support services.

43. Defendant ALTRIA ENTERPRISES LLC ("AE") is a wholly-owned subsidiary of AGI. AE is a Virginia limited liability company with its principal place of business in Richmond,

Virginia. AE is a party to the purchase agreement between AGI and JLI. AE purchased Altria's stake in JLI on Altria's behalf.

44.    AGI, Philip Morris, ACS, AGDC, and AE are referred jointly as the "ALTRIA DEFENDANTS" or "ALTRIA."

45.    JLI and the ALTRIA DEFENDANTS are referred to jointly herein as the "JUUL DEFENDANTS."

### C.    The JUUL E-Liquid Manufacturing Defendants

46.    Defendant MOTHER MURPHY'S LABS, INC. ("MOTHER MURPHY'S") is a North Carolina corporation, with a principal place of business in North Carolina. Mother Murphy's is in the business of manufacturing and supplying E-Liquids and the ingredients and additives in E-Liquids including the E-Liquid in JUUL.

47.    Defendant ALTERNATIVE INGREDIENTS, INC. ("ALTERNATIVE") is a wholly owned subsidiary of Mother Murphy's. Alternative is a North Carolina corporation, having a principal place of business in North Carolina. Alternative is in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL.

48.    Defendant TOBACCO TECHNOLOGY, INC. ("TTI") is a Maryland corporation, with a principal place of business in Maryland. TTI is in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL.

49.    Defendant ELIQUITECH, INC. ("ELIQUITECH") is a wholly-owned subsidiary of TTI. ELiquitech is a Maryland corporation, with a principal place of business in Maryland. ELiquitech is in the business of manufacturing and supplying E-Liquids, flavoring additives and raw ingredients in E-Liquids, including the E-Liquid in JUUL.

50.    Mother Murphy's, Alternative, TTI, and ELiquitech, are referred to jointly herein as the "JUUL E-LIQUID MANUFACTURING DEFENDANTS."

### D.    The Distributor Defendants

51. Defendant MCLANE COMPANY, INC. ("MCLANE") is a Texas corporation with a principal place of business in Temple, Texas. McLane is a wholly owned subsidiary of Berkshire Hathaway.[4]

52. Defendant EBY-BROWN COMPANY, LLC ("EBY-BROWN") is a Delaware limited liability company with a principal place of business in Naperville, Illinois. In 2019, Eby-Brown was acquired by Performance Food Group.

53. Defendant CORE-MARK HOLDING COMPANY, INC. ("CORE-MARK") is a Delaware corporation. From 2015-2018, Core-Mark's principal place of business was San Francisco, California. As of 2019, Core-Mark's principal place of business is in Westlake, Texas.

54. McLane, Eby-Brown and Core-Mark were responsible for distribution of JUUL products throughout the country and are referred to jointly herein as the "DISTRIBUTOR DEFENDANTS."

**F.    The Retailer Defendants**

55. Defendants Bella Deli Market Corp., ("DEFENDANT BELLA DELI") is a New York corporation with a principal place of business in the Bronx., New York.

56. Beginning in 2017 and up to the time of his death in 2019, DENIS N. BYRNE, JR. purchased JUUL products and other vaping products on numerous occasions at Bella Deli, located at 4011 E. Tremont Ave., Bronx, New York.

57. Defendant TAG DELI GROCERY STORE CORP., d/b/a TAG SMOKE SHOP ("DEFENDANT TAG SMOKE SHOP") is a New York corporation with a principal place of business in the Bronx., New York.

58. Beginning in 2017 and up to the time of his death in 2019, DENIS N. BYRNE, JR. purchased JUUL products and other vaping products on numerous occasions at TAG SMOKE SHOP, located at 1905 Williamsbridge Rd., Bronx, New York.

---

4 https://www.mclaneco.com/content/mclaneco/en/home.html.

59.     Defendants BELLA DELI and TAG SMOKE SHOP are referred to jointly herein as the "RETAILER DEFENDANTS."

## IV.     FACTUAL ALLEGATIONS

### A.     JUUL Defendants Seek to Re-create the "Magic" of the Cigarette, the "Most Successful Consumer Product of All Time", using the Cigarette Industry's Playbook.

60.     JLI's founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . . an amazing product."[5] Because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[6]

61.     Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[7] With a focus on recreating the "ritual and elegance that smoking once exemplified,"[8] Monsees and Adam Bowen set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."[9]

62.     JLI used the cigarette industry's prior practices as a playbook. Monsees has publicly admitted that JLI built its e-cigarette business by first consulting cigarette industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate

---

5 Kathleen Chaykowski, *Billionaires-to-be: Cigarette breakers - James Monsees and Adam Bowen have cornered the US e-cigarette market with Juul. Up next: The world*, FORBES Magazine (Sep 27, 2018), *available at* www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1 (as of December 9, 2019).

6 Josh Mings, *Ploom model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, Solid Smack (Apr 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/ (as of December 9, 2019).

7 *Id.*

8 *James Monsees – Co-founder and CEO of Ploom*, IDEAMENSCH (Apr 11, 2014), https://ideamensch.com/james-monsees/ (as of December 9, 2019).

9 *Id.*

because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch right up to a huge, huge industry in no time. And then we started building prototypes."10

63. JLI researched how cigarette companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."11 Among the documents JLI would have found were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.

64. JLI also engaged former cigarette industry researchers to consult on the design of their product. JLI's founder James Monsees noted in Wired magazine that "people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty." The Wired article stated that "some of those people are now on Pax's team of advisers, helping develop JUUL."12

65. JLI also used cigarette industry advertisements—which were created to lure nonsmoking youth—as a blueprint for JUUL's advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."13

---

10 Gabriel Montoya, *Pax Labs: Origins With James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (as of December 9, 2019).

11 *Id.*

12 David Pierce, *This Might Just Be The First Great E-Cig*, *WIRED*, (Apr 21, 2015), www.wired.com/2015/04/pax-juul-ecig/ (as of December 9, 2019).

13 Robert K. Jackler *et al.*, *JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising*, Stanford University School of Medicine (Jan 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (as of December 9, 2019).

66.     JLI achieved its vision. Since its launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells-Fargo report, JUUL owns three-quarters of the e-cigarette market.[14]

**B.      JUUL is a Sleek, Easy to Conceal Nicotine Delivery Device with Kid-Friendly Flavors.**

67.     The JUUL e-cigarette looks sleek and high-tech.  JUUL looks like a USB flash drive, and it actually charges in a computer's USB drive. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand. JUUL is easy to conceal from parents and teachers. The odor emitted from JUUL is a reduced aerosol without much scent – unlike the distinct smell of conventional cigarettes.

68.     The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

 

14  Richard J. Durbin *et al.*, *Letter from United States Senators to Kevin Burns CEO JUUL Labs Inc. (Apr 8, 2019)*, www.durbin.senate.gov/imo/media/doc/ FINAL%20JUUL%20Letter%204.8.19.pdf (as of December 9, 2019).

69.    JLI manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid. JLI exclusively sells its pods in four-packs, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12 to 17-year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brulee.15   DENIS N. BYRNE, JR. started using JUUL at the age of 15 and regularly used JUUL products.





70.    The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendants finely tuned the amount of nicotine vapor the JUUL delivers.16

### C.    JLI and the E-Liquid Manufacturers Developed Flavored JUUL products That Would Appeal to Youth and Contain Toxic Ingredients

71.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine.[17] A 2004 study found that seventeen-year-old

---

15 Jeffrey Willett, Shroeder Institute, *JUUL: Recognition, use and perceptions* (Apr 26, 2018), www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf (as of December 9, 2019).

16 Soha Talih *et al.*, *Characteristics and toxicant emissions of JUUL electronic cigarette,* Tobacco Control 2019; 28: 678-680, *available at* https://tobaccocontrol.bmj.com/content/28/6/678 (as of December 9, 2019).

17 A Sept. 1972 Brown & Williamson internal memorandum titled "Youth Cigarette New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979

smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[18]

72.     In June 2015, JUUL came to market in four flavors including tabaac (later renamed Tobacco), fruut (later renamed Fruit Medley), bruulé (later renamed Crème Brulee), and miint (later renamed Mint).

73.     JUUL later offered other kid-friendly flavors, including Cool Mint, Cucumber, and Mango.

74.     In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[19] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors.

75.     The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."20

---

Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.

18 Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

19https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#1.

20 *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes, a new study has found."

76.     Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.21  Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

77.     In a recent study, 74% of youth surveyed indicated that their first-use of a JUUL was of a flavored JUULpod.22

78.     Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.

79.     JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Dick Durbin. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

80.     A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."23

---

21 *See How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

22 Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA Network Open e183535 (2018), https:// doi:10.1001/jamanetworkopen.2018.3535.

23 Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

81. JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

82. Upon information and belief, Defendant JLI, entered into an agreement with Defendant MOTHER MURPHY'S and Defendant ALTERNATIVE in or around 2014 wherein in conjunction with JLI, MOTHER MURPHY'S and ALTERNATIVE designed, manufactured and supplied flavoring additives and flavored E-liquids pursuant to JLI directives and specifications derived from their patents for use in its JUULpods. Upon information and belief, MOTHER MURPHY'S and ALTERNATIVE continue to design, manufacture and supply flavoring additives and flavored e-liquids to JLI for use in its JUULpods presently.

83. MOTHER MURPHY'S and ALTERNATIVE would use their own chemical additives and flavorings to formulate the e-liquids but "the overall manufacturing processes are unique to the JUUL system and the formulas and chemistries for the e-liquids for the JUUL system, are proprietary to JLI" as alleged in JLI's responses to Congress.

84. MOTHER MURPHY'S and ALTERNATIVE would report regularly to JLI as to the production processes and progress and took direction from JLI as to business directives, including phone calls, e-mails and regular forms of electronic communication coming from JLI.

85. Upon information and belief, MOTHER MURPHY'S and ALTERNATIVE performed "one-third of the final nicotine production" for JUUL products that go into the e-liquid mix.

86. Defendant MOTHER MURPHY'S describes itself as "an industry leader in flavor innovation." According to its website:

> MOTHER MURPHY'S is a food flavoring business, family-owned and operated since 1946. We ship food flavorings, flavor extracts and powered flavorings to over 30 different countries. We are very innovative, and our in-house chemists are always developing and seeking new flavor extracts and powdered flavorings to add to our library of already more than 60,000 flavors. In fact, we say 'if you can imagine it, we can create it'.

87. Upon information and belief, MOTHER MURPHY'S is the parent company of ALTERNATIVE. ALTERNATIVE's website was taken down in the Fall of 2019 when news broke that a lawsuit had been filed by a former JLI employee alleging that ALTERNATIVE supplied over a million contaminated pods which JLI sold to users, including teenagers and young adults, with reckless disregard for consumer safety.[24]

88. A snapshot of ALTERNATIVE's website from 2016 accessed through wayback.org internet archive, describes ALTERNATIVE as "Established in Greensboro, North Carolina, ALTERNATIVE Ingredients, Inc. was created to serve the relatively new Vaping Industry, also known as the Electronic Nicotine Delivery Systems (ENDS) industry. Our product offering include E-Flavor Concentrates, Nicotine Solutions and finished E-Liquids." It also states that:

> We emphasize that while we have sought to create a group of flavors compatible with the ENDS industry, to our knowledge, no independent studies have been conducted which document the safety of these flavors in a vaping environment or in e-cigarettes. We expect that these studies will be forthcoming, but until they are released, we make no representation or warranty as to the safety of these flavors when used in a vaping environment or in e-cigarettes.[25] (emphasis added).

However, no such warning was provided when the e-liquids were shipped and/or sold to millions of consumers throughout the United States. MOTHER MURPHY'S and ALTERNATIVE did not see to it that JLI provide the same reservation as to lack of safety

---

24 *See Breja v. JUUL labs, Inc.*, NDCA 3:19-cv-07148.

25 https://web.archive.org/web/20160312122149/http://www.alternativeingredients.com/

tasting and lack of warranty as to the safety of the chemical flavoring additives to the consumers that they themselves cautioned about to their potential vaping industry customers.

89.    In conjunction with JLI, MOTHER MURPHY'S and ALTERNATIVE designed, manufactured, and supplied flavoring ingredients for JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in vaping products. Accordingly, JLI, MOTHER MURPHY'S and ALTERNATIVE's design, manufacture, and supply of JUUL e-liquids was done with reckless disregard for the safety of consumers including, DENIS N. BYRNE, JR., and millions of teenagers, young adults and older adults who unknowingly inhaled e-liquids containing flavoring additives that were never tested to determine whether they were safe for use in this manner and for which Defendants knew, or should have known, carried a severe and significant inhalation risk to the lung and other organs. MOTHER MURPHY'S and ALTERNATIVE placed JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. MOTHER MURPHY'S and ALTERNATIVE knew or should have known that the e-liquid it designed, and was manufacturing and supplying was an inherently dangerous and toxic product which could cause the personal injuries as described herein.

90.    Due to the continued blockbuster success and increased demand for JUUL, as well as anticipated global expansion, JLI entered into an agreement with the Maryland based corporations Defendant TTI and Defendant ELIQUITECH in or around 2017 wherein TTI and ELIQUITECH also manufactured and supplied flavoring additives and flavored e-liquids for use in JLI's JUULpods. Upon information and belief, TTI and ELIQUITECH continue to design, manufacture and supply flavoring additives and flavored e-liquids in conjunction with JLI for use in its JUULpods presently.

91.    TTI and ELIQUITECH would use their own chemical additives and flavorings to formulate the e-liquids but "the overall manufacturing processes are unique to the JUUL system

and the formulas and chemistries for the e-liquids for the JUUL system, are proprietary to JLI" as alleged in JUUL sworn responses to Congress.[26]

92.     In addition to MOTHER MURPHY'S and ALTERNATIVE, Defendants TTI and ELIQUITECH also, based upon contractual relations with JLI, also used specifications created by JLI, and designed, manufactured and supplied flavoring ingredients and blended the JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. TTI and ELIQUITECH placed JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. TTI and ELIQUITECH knew, or should have known, that the e-liquid it was designing, manufacturing, and supplying in conjunction with JLI was an inherently dangerous and a toxic product which could cause the personal injuries as described herein.

93.     Neither TTI or ELIQUITECH had ever tested the products for safety risks associated with utilizing the material in e-liquids. In fact, TTI and ELIQUITECH were fully aware that the Safety Data Sheets prepared for each flavoring additive specifically stated that the ingredient carried inhalation health risks. Despite the knowledge of the inhalation risks, TTI and ELIQUITECH manufactured e-liquids utilizing these ingredients and placed the product into the stream of commerce for millions of people, including DENIS N. BYRNE, JR., to inhale without warning of any risks caused by inhaling of the ingredients contained therein.

94.     The flavoring additives and raw ingredients manufactured and supplied by the E-LIQUID MANUFACTURERS and used in the JUUL e-liquid formulations as designed in conjunction with JLI are associated with severe and significant risks of acute and chronic lung injuries. The E-LIQUID MANUFACTURERS knew, or should have known of the risks and failed to warn DENIS N. BYRNE, JR., and failed to ensure that its' contractual partner/customer JLI warned its consumers of the risks, in reckless disregard for human safety.

---

26 *Id.*

95.     The aforementioned E-LIQUID MANUFACTURERS were all manufacturers and
suppliers of flavoring ingredients for JUUL E-liquids utilizing flavoring additives. The
E-LIQUID MANUFACTURERS were negligent in that they failed to warn and failed to ensure
its contractual partner JLI warned the consumers and users of the risks associated with inhaling
their products contained in the JUUL e-liquid and thereby acted in reckless disregard for the
safety of the public, consumer and users of JUUL including millions of teenagers, young and
older adults. The E-LIQUID MANUFACTURERS were otherwise negligent and liable for the
injuries sustained by DENIS N. BYRNE, JR..

### D.     JLI Designed its E-Cigarettes to Make them Easy for Young People to Inhale and to Deliver Substantially Higher Doses of Nicotine than Cigarettes.

96.     According to the National Institutes of Health, the "amount and speed of nicotine
delivery . . . plays a critical role in the potential for abuse of tobacco products."[27] The cigarette
industry has long known that "nicotine is the addicting agent in cigarettes"[28] and that "nicotine
satisfaction is the dominant desire" of nicotine addicts.[29]

97.     For this reason, cigarette companies spent decades manipulating nicotine in order
to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company
("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase
nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept
to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was

---

[27] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable
Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010),
*available at* www.ncbi.nlm.nih.gov/books/NBK53017/ (as of December 9, 2019).

[28] Tobacco Industry Quotes on Nicotine Addiction, Brown & Williamson official A.J. Mellman, 1983,
https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addicti
on.pdf (as of December 9, 2019).

[29] *Id.*, R.J. Reynolds Tobacco Co. marketing memo, 1972.

expected to give cigarettes an "additional nicotine 'kick'."30 This kick was attributed to increased nicotine absorption associated with lower pH.31

98.     JLI knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

99.     In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL device said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it …" He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."32

100.     JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found that JUUL's e-liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine.33

---

30 *Id.*, 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."

31 Neal L. Benowitz *et al.*, *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology* (Oct 12, 2010), Handb Exp Pharmacol 192: 29–60, *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/ (as of December 9, 2019).

32 David Pierce, *This Might Just Be The First Great E-Cig*, WIRED, (Apr 21, 2015), *www.wired.com/2015/04/pax-juul-ecig/* (as of December 9, 2019).

33 J.H. Lauterbach, *One More Time Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?*, www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf  (as of December 9, 2019);

FILED: BRONX COUNTY CLERK 09/28/2021 01:13 PM

Case 1:21-cv-09110-JPC Document 1-1 Filed 11/03/21 Page 28 of 117

101. Additional studies have confirmed the low ratio of free-base nicotine in JUUL products. *See* Anna K. Duell *et al.*, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by ¹H NMR Spectroscopy*, Chem. Res. Toxicol. 2018 Jun 18; 31(6): 431-434, ("Duell Study").

102. The vapor from JUUL's e-liquid contains about the same ratio of freebase nicotine—and hence causes the same amount of irritation—as a nearly nicotine-free 3 mg/mL e-liquid.34

103. The authors of the "Duell Study" found that the low freebase fraction in its aerosols suggested a decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability.

104. The authors noted that "tobacco company documents suggest that products [like JUUL] with high nicotine levels but a low [percentage of freebase nicotine] will yield vape aerosols of much reduced harshness as compared to products with even only moderate nicotine levels" but high percentages of freebase nicotine. *Id.*

105. JLI's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for young non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. The design also shows that JLI's intention was to recruit nonsmokers, not existing smokers, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

106. The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth." 35

---

Anna K. Duell *et al.*, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by ¹H NMR Spectroscopy*, Chem. Res. Toxicol. 2018 Jun 18; 31(6): 431-434, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/ (as of December 9, 2019).
34 *Id.*, Duell Study, Fig. 3.

Case 1:21-cv-09110-JPC   Document 1-1   Filed 11/03/21   Page 29 of 117

107.   JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that he is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction, and repeatedly exposing the user to the health risks associated with the product, such as significantly increased blood pressure.

108.   JUUL products contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine.

109.   Blood plasma studies in U.S. patent No. 9, 215, 895 ('895 patent36) show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette).   Nicotine salts also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

110.   JLI's '895 patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("$C_{max}$") of approximately 15 ng/mL, compared to a $C_{max}$ of 11 ng/mL for a Pall Mall cigarette.[37]

---

35  *Id.*, Duell Study (*citing* Willett, *et al.*, *Recognition, use and perceptions of JUUL among youth and young adults*, Tobacco, Tob Control. 2019 Jan;28(1):115-116).

36  *See* U.S. Patent No. 9, 215, 895.

37  '895 Patent, at col. 26, ll. 33-50.

111.    As high as the reported nicotine dose reported for JUULpods is, the actual dose is likely higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a 4.5% benzoic acid (44.8 ± 0.6) solution.38 That study found that JUULpods contained a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised. JUULpods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the '895 patent produce higher nicotine absorption than expected for the advertised formulation.

112.    Other studies have reported even higher actual concentrations of nicotine in JUULpods.  Some experts estimate that JUULpods deliver the same nicotine as two packs of cigarettes.39

113.    In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."40 With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUULpod will easily exceed the nicotine dose of a traditional cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and Israel is

---

38 James F. Pankow *et al.*, *Benzene formation in electronic cigarettes* (Mar 8, 2017) PLoS One. 2017; 12(3): e0173055, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5342216/ (as of December 9, 2019).

39 *6 important facts about JUUL*, Truth Initiative, https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul (as of December 9, 2019)

40 *E-Cigarettes,* https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (as of December 9, 2019) (*citing* United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

seeking to do the same. 41 As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."42

114.    Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." *See* Samantha M. Reilly *et al., Free Radical, Carbonyl, and Nicotine Levels Produced by Juul Electronic* Cigarettes, Nicotine & Tobacco Research, Volume 21, Issue 9, Sept. 2019, 1274-1278. ("Reilly Study").

115.    The Reilly Study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 µg/puff. *See* Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, Tobacco Control, 2014 May; 23(Suppl 2):ii30-ii35, ("Shroeder Study"). Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 µg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

116.    Because "nicotine yield is strongly correlated with tobacco consumption,"43 a JUULpod with more nicotine will strongly correlate with higher rates of consumption of

---

41 Julia Belluz, *Juul, the Vape Device Teens are Getting Hooked On, Explained* (Dec 20, 2018) Vox, https://www.vox.com/science-and-health/2018/5/1/17286638/juul-vaping-e-cigarette (as of December 9, 2019).

42 Ronny Linder, *JUUL Warns It Will Fight Israel Over Its Potential Ban on E-Cigarettes* (June 30, 2018), HAARETZ, www.haaretz.com/israel-news/business/juul-warns-it-will-fight-israel-over-potential-ban-on-its-e-cigarettes-1.6140058 (as of December 9, 2019).

43 Martin Jarvis *et al.*, *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey* (Jan 2001), JNCI Vol. 93, Issue 2,

JUULpods, generating more revenue for Defendants. For example, a historic cigarette industry study looking at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."44 In other words, the more nicotine in the cigarettes, the more cigarettes a person smoked.

117. Despite the above data, the JUUL DEFENDANTS have failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

118. By delivering such potent doses of nicotine, JUUL products magnify the health risks posed by nicotine, significantly increase blood pressure, and place users at heightened risk for stroke, heart attacks and other cardiovascular events.

119. Further, because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes. As one of the JUUL founders has said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all…anything about health is not on our mind."45 Thus, JUULpods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact that has not been disclosed.

120. At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale. According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health."46

---

134–138, *available at* https://academic.oup.com/jnci/article/93/2/134/2906355 (as of December 9, 2019).

44 UCSF Library, 1003285443-5443 (US 85421).

45 Nitasha Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette: Surprise, it's a rectangle*, The Verge (April 21, 2015),
https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul (as of December 9, 2019).

46 Duell Study, 431

121.   This powerful combination—highly addictive and easy to inhale—also repeatedly exposes users to the toxic chemicals in the vapor, compounding the health risks to users, as described above.

122.   In addition to its nicotine content, the "Cool" Mint pods pose additional risks. The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke." *See* Robert N. Proctor, Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition, 500 (1st ed. 2011). Mint could also "facilitate deeper and more prolonged inhalation," resulting in "greater smoke intake per cigarette." *Id.* at 500-501.

123.   JUUL DEFENDANTS have fraudulently concealed material information about the addictive and dangerous nature of JUUL and vaping and Defendants are necessarily in possession of all of this information.

124.   Hence, JUUL's design offers no benefit to young people like DENIS N. BYRNE, JR. who was not addicted to cigarettes or any form of nicotine before they started using JUUL, and only offers risks.

**E.   JLI Conspired with Others in the Cigarette Industry to Engage Third-Party Spokespersons to Downplay the Risks of E-cigarettes, Create Doubt, and Misrepresent the Benefits of Nicotine.**

125.   Because JLI understood that it could not specifically make health-related claims without drawing the ire of the FDA, JLI conspired with others, including Defendants Philip Morris USA and Altria, in the cigarette industry to engage consultants, academics, reporters, and other friendly sources such as the American Enterprise Institute, to serve as spokespersons and cheerleaders for e-cigarette products.   Taking yet another page from the cigarette-industry playbook, these influencers masked their connection to the e-cigarette industry, while serving as its mouthpiece to cast doubt about risks and overstate benefits.

126.   For example, just as JUUL launched, cigarette company expert witness Sally Satel published an article in Forbes Magazine touting the benefits of nicotine—claiming it aids in

concentration—and stating that it is harmless.47   In another article, she lauded efforts by JLI and others to develop nicotine-related products, and cast any doubters as hysterical and creating a "panic."48

127.    Numerous other articles, videos, and podcasts—also spread through social media—echoed this same message that the public health community was overreacting to e-cigarettes and in a panic about nothing.

128.    During each of its multiple fundraising rounds, JLI assured potential investors that addiction to something that is not harmful is not harmful, suggesting that JUUL was no more harmful than coffee.

129.    On information and belief, JLI and its co-conspirators spread this message through hired third-party spokespersons and influencers.

130.    Furthering their campaign of doubt and confusion, when asked directly about health risks, JLI's employees and founders would point reporters to other sources to indicate that its products had been shown to be safe, or not harmful, rather than admit what it knew were the dangers.

131.    JLI well-understood from the cigarette industry playbook that sowing doubt and confusion over the benefits and risks of e-cigarettes is key to long-term success.   First, by creating a "two-sides-to-every-story" narrative, JLI reduced the barriers for young people and new users to try the product, and gave addicted users permission to keep using the product and avoid the pain of withdrawal.   Second, by engaging people who looked like independent experts, JLI staved off regulation and suppressed political opposition, allowing it a long runway to capture market share. Third, by belittling the public health community, JLI neutered its most vocal threat.

---

47 Sally Satel, *Nicotine Itself Isn't The Real Villain* (Jun 19, 2015), Forbes, *available at* www.forbes.com/sites/sallysatel/2015/06/19/nicotine-can-save-lives/#60379f766f43 (as of December 9, 2019).

48 Sally Satel, *Why The Panic Over JUUL And Teen Vaping May Have Deadly Results* (Apr 11, 2018), Forbes, *available at* www.forbes.com/sites/sallysatel/2018/04/11/why-the-panic-over-juul-and-teen-vaping-may-have-deadly-results/#6b1ec693ea48 (as of December 9, 2019).

132.    On information and belief, JLI conspired with others in the cigarette industry to fraudulently conceal the risks of e-cigarettes, recognizing that a campaign of doubt, misinformation and confusion would benefit all of them and would be the key to the industry's survival.

### F.    The Amount of Nicotine in each JUULpod is Intentionally Misrepresented and Grossly Understated.

133.    From JUUL's pre-release announcements to this day, the JUUL Defendants have continuously falsely represented that each pod contains only as much nicotine as a pack of cigarettes. JLI repeats these claims widely in advertisements, press releases, on its packaging, and on its web site.  For example, some JUUL advertisements and JUUL's website provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs."

134.    This statement is false and seriously misleading because, as JLI knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and other health risks.

135.    JUUL DEFENDANTS know that benzoic acid affects pH and "absorption of nicotine across biological membranes."[49]

136.    Moreover, the form of nicotine JUULpods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume, leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUULpods in fact contain slightly more nicotine than a solution that is 6% nicotine by volume.

137.    The "5% strength" statement in the JUUL DEFENDANTS' marketing, advertisements and promotions misrepresents the most material feature of the JUUL product – the

---

49 Neal L. Benowitz *et al.*, *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology* (Oct 12, 2010), Handb Exp Pharmacol 192: 29–60, *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/ (as of December 9, 2019).

nicotine content – and has misled consumers to their detriment. The "5% strength" statement also confuses resellers of JUULpods, who assume that "5% strength" means "50mg/mL" nicotine by volume. These resellers then compound confusion among by consumers by stating that JUULpods contain "50 mg/mL," which they do not.50

138.    The "5% strength" statement in the JUUL DEFENDANTS' marketing, promotions and advertisements is also misleading because JUULpods routinely contain more than even the 59 mg/mL claimed on the JUUL website. At least two independent studies testing multiple varieties of JUUL pods have found significantly higher concentrations of nicotine than JUUL's label and advertising represents.

139.    JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the actual amount of nicotine consumed via JUULpod is as much as twice as high as a pack of cigarettes.

140.    Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL can be inhaled continuously, and often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks. Thus, the device design leads users to intake far more nicotine than would occur with cigarettes.

141.    Finally, the JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the

---

50 See, e.g. Tracy Vapors, Starter Kits, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, Ecigarette Reviewed, (March 20, 2017)* https://ecigarettereviewed.com/juul-review("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review,* eCig One (Oct. 26, 2016), https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, https://web.archive.org/web/20190718190102/westcoastvapesupply.com/products/juul-starter kit ("5%... 50mg"); Vapor4Life, *How Much Nicotine is In a JUUL?* ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/.

upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of extraordinarily high levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine and poses additional health risks.

142.    Contrary to the JUUL DEFENDANTS' representations, the above data indicate that each JUULpod delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff.   JLI's products thus have the foreseeable effect of luring youth, who react positively to a strong nicotine "kick," and exacerbating nicotine addiction and adverse health effects associated with nicotine consumption.

143.    Thus, JUUL and vaping are more harmful when compared to cigarettes, in that the extraordinarily high levels of nicotine can cause acute and chronic lung injuries, heightened blood pressure and stroke, and the repetitive exposure to the toxins and chemical in JUUL can also cause vascular damage.

### G.    **DENIS N. BYRNE, JR. Was Never Warned that JUUL's Products Were Unsafe and Dangerous.**

144.    Defendants involved in the design, manufacture, assembly, inspection, testing packaging, labeling, marketing, advertising, promotion, supply, distribution, and sale of JUUL products failed to provide any warnings that JUUL products were unsafe for him, nor instruct him on how much JUUL would be safe to consume.

145.    Despite adding a nicotine warning to its packaging in August of 2018, the warning remains inadequate in that it does not adequately convey the known effects, or possible long-term effects, of nicotine, addiction to nicotine or vaping/inhaling nicotine salts.

146.    Furthermore, JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength.

147.    Instead, JLI marketed its JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are not harmful like traditional cigarettes and safe to use.

148.    DENIS N. BYRNE, JR. did not and could not have known the risks associated with JUUL and vaping, because Defendants had exclusive knowledge about its product, including its design, and concealed that information from him.

149.    Instead, as a result of JUUL's wildly successful marketing campaign, based on tactics developed by the cigarette industry and amplified in social media, DENIS N. BYRNE, JR. reasonably believed that JUUL and vaping was safe, harmless, fun, and cool—a thing to do with friends.

150.    A 2017 study by the Truth Initiative Schroeder Institute® found that 6 percent of youth and 10 percent of young adults have used a JUUL e-cigarette in the last 30 days. The study also found that while many young people are aware of JUUL, many are unaware that the product always contains the addictive chemical nicotine:

a.    Twenty-five percent of survey respondents aged 15 to 24 recognized a JUUL e-cigarette device when shown a photo of the product.

b.    Among those who recognized JUUL, 25 percent reported that use of this product is called "JUULing," indicating that this product is so distinctive, it is perceived as its own category.

c.    Fully sixty-three percent of JUUL users did not know that this product always contains nicotine.

**H.    Despite Knowledge That Its Products Were Unsafe for Particularly Young People, JLI Deployed a Deceptive and Unfair Viral Marketing Campaign to Entice Young People to Start JUULing**

151.    As described further below, the JUUL DEFENDANTS used the same strategies perfected by the cigarette industry to sell JUUL products to young people. In particular, JLI has both exploited regulatory loopholes and relied heavily on social media and other viral advertising tools to hook people, and in particular young persons, on its addictive e-cigarettes.

152.    To accomplish this, JLI adopted the same themes used by Philip Morris and other cigarette companies in the industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

1. **Overview of Viral Marketing Campaigns and Online Marketing**

153. "Viral marketing" is defined as "marketing techniques that seek to exploit preexisting social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[51] Viral marketing is a form of word-of-mouth recommendation that harnesses the network effect of the internet to rapidly reach a large number of people. Because the goal in a viral marketing campaign is to turn customers into salespeople who repeat a company's representations on its behalf, a successful viral marketing campaign may look like millions of disconnected, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaign.

154. Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

155. Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform ("Social Medial Platforms").[52] A company that wants to push an ad on Social Media Platforms has a few options. First, the company can solicit followers to its social media pages, so that when the company posts to its feed, the content would

---

51 Rebecca J. Larson, *The Rise of Viral Marketing through the New Media of Social Media* (2009), Liberty University Pub.,
https://digitalcommons.liberty.edu/cgi/viewcontent.cgi?article=1009&context=busi_fac_pubs (as of December 9, 2019).

52  John-Robert Skrob, *The viral marketing concept as a model for open source software to reach the critical mass for global brand awareness based on the example of TYPO3* (Aug 2005), University of Applied Science Kufstein, Austria, *available at*
https://www.researchgate.net/publication/237311819_Open_Source_and_Viral_Marketing_The_viral_ma rketing_concept_as_a_model_for_open_source_software_to_reach_the_critical_mass_for_global_brand_ awareness_based_on_the_example_of_TYPO3 (as of December 9, 2019).

be delivered to those followers and to those who visited the company page. Second, the company can purchase paid advertisements that were delivered to specified target audiences. Then, to amplify a message, companies can utilize other tools, such as paid influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with advertisements across social media.

156.    Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences. As Mark Zuckerberg, founder and Chief Executive Officer of Facebook explained: "Nothing influences people more than a recommendation from a trusted friend…A trusted referral is the Holy Grail of advertising."[53]

157.    With the advent of social media, viral marketing campaigns have become a particularly effective way to reach young people, particularly teenagers. Teenagers tend to use social media far more than adults, and tend to be more susceptible to peer pressure. 95% of teens report having use of a smart phone.[54] 45% report being online "constantly."[55] 85% use YouTube.[56] 72% use Instagram, and 69% use Snapchat.[57]Adolescents also have a far stronger herding instinct than adults. The desire to fit in and look cool means that adolescents drive new trends online. As many businesses know, young people are often skeptical of traditional advertising and the tactics of large corporations. Thus, by pushing a viral marketing campaign, these businesses can reach consumers who might ignore typical advertising and are more likely to

---

53 Aline van Duyn, '*Facebook ads' to change way of marketing,* Financial Times (November 6, 2007), *available at* https://www.ft.com/content/01341240-8cbd-11dc-b887-0000779fd2ac (last accessed December 9, 2019). *See also Perkins v. LinkedIn Corp.* (N.D. Cal. 2014) 53 F.Supp.3d 1190, 1210   ("One of the principal reasons such viral marketing is superior to other forms of marketing is the source: viral marketing comes from a friend or contact with whom the recipient is familiar and trusts as opposed to an unfamiliar or untrusted source.").

54 Monica Anderson & Jingjing Jiang, *Teens, Social Media & Technology 2018* (May 31 2018), Pew Research Center, www.pewinternet.org/2018/05/31/teens-social-media-technology-2018/ (as of December 9, 2019).

55 *Id.*

56 *Id.*

57 *Id.*

respond to an advertisement that does not look or feel like an advertisement, but instead is a message shared by a friend, a peer, or some other person influential to the viewer.

158.    Companies can also take viral messaging off-line. By running simple, catchy ads with minimal text and graphic visuals, and displaying those ads in various forms, companies generate buzz and discussion, which is reinforced through social media.

### 2.    The Cigarette Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products.

159.    To remain profitable, the tobacco industry must continue to woo new customers: some existing customers wean themselves from addiction and the others eventually die, so replacement customers are needed. In recent years, tobacco usage in the United States has fallen dramatically, with particularly large decreases in the youth smoking rates, which cigarette companies have been vigorously trying to counteract. The cigarette industry knows that the younger a person starts smoking, the longer they will have a customer. Historically, cigarette companies fought to increase share penetration among the 14-24 age group because "young smokers have been the critical factor in the growth" of tobacco companies, and "the 14-18 year old group is an increasing segment of the smoking population."[58]  The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years."[59]

160.    It is well-established that "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris* (D.D.C. 2006) 449 F. Supp.2d 1, 570.

161.    Because teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy

---

58 Memo to: C.A. Tucker from: J.F. Hind Re: "Meet the Turk" (January 23, 1975), http://legacy.library.ucsf.edu/tid/lve76b00 (as of December 9, 2019).
59 Mr. C.A. Tucker Presentation to RJRI BOfD - 9/30/74 (740930), "Marketing Plan" (1974), *www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091* (as of December 9, 2019).

advertisements providing cues for the "right" way to look and behave amongst peers. *Id.* at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.* at 570, 590. By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id.* at 1072.

162.    The landmark *USA v. Philip Morris* case revealed that tobacco companies targeted adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." No. 99-cv-2396, ECF 5732, ¶ 2682 (D.D.C. 2008). In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id.* at ¶ 2674.

163.    Thus, the industry has long used viral marketing campaigns to push its products on children, teens, and young adults. Prior to the advent of the Internet, cigarette companies engaged in "viral advertising" or "influential seeding" by paying "cool people" to smoke in select bars and clubs, with the "idea being that people will copy this fashion, which would then spread as if by infection."60 By simply paying some attractive, stylish third parties to use the product in trendy public places, tobacco companies were able to create buzz and intrigue. As word spread, the public would develop a strong association that smoking was what young, cool adults were doing.

164.    Today, cigarette manufacturers like Defendant Altria are limited in their ability to advertise in the United States, but actively use viral marketing techniques outside of the United States. For example, Japan Tobacco International, one of JLI's early investors, launched social media campaigns including a "Freedom Music Festival" promoting Winston cigarettes in

---

60 Golden Holocaust, at 119 (*citing* Ted Bates and Co., Copy of a Study of Cigarette Advertising Made by J.W. Burgard; 1953, (Lorillard), n.d., Bates 04238374-8433.

Kazakhstan Kyrgyzstan, and Jordan. Similarly, Philip Morris International, a spin-off of Defendant Altria, JLI's largest stakeholder, has used influencer campaigns in multiple countries. A campaign in Indonesia called "I Decide To" has been viewed more than 47 million times online. A hashtag marketing campaign called #NightHunters in Uruguay used paid influencers to pose with menthol cigarettes and was seen by nearly ten percent of Uruguay's population.[61]

165. An influencer paid to promote Philip Morris brands stated that Philip Morris targets a "super young profile" for its influencers . . . . the people they selected are always the youngest. They look for young people that have large groups of friends so [the social media promotional message] gets expanded more and more."[62] Another influencer allegedly stated that "we had a training session with the person in charge of marketing in Marlboro, she talked to us about how difficult it was for them to advertise due to all the laws in place. She also talked to us about . . . [linking] the brand to certain colors or situations."[63]

166. A study carried out by the campaign for tobacco-free kids, reported that "tobacco companies are secretly paying social media stars to flood your newsfeed with images of their cigarette brands."[64] In a nutshell, "young social media stars are paid to make smoking look cool." [65] A gallery of influencer posts is available at: https://www.takeapart.org/wheretheressmoke/gallery/.

167. Similarly, in 1988 the R.J. Reynolds Tobacco Company introduced the infamous Joe Camel cartoon campaign, which faced instant criticism due to how appealing the cartoon animal was to children and teens. Joe Camel was drawn as sleek, metropolitan figure, typically wearing sunglasses or a tuxedo, or was depicted driving convertibles, gambling, or playing pool. The ads often used the phrase "Smooth Character," which to teenagers, meant he had a slick, cool

---

61 Campaign For Tobacco-Free Kids, *New Investigation Exposes How Tobacco Companies Market Cigarettes on Social Media in the U.S. and Around the World* (Aug 27, 2018), www.tobaccofreekids.org/press-releases/2018_08_27_ftc (as of December 9, 2019).

62 *Id.*

63 *Id.* (brackets in original).

64 *Id.*

65 *Id.*

personality. That in turn led to an association between smoking and coolness in the minds of young people. To ensure that message stuck, R.J. Reynolds put up billboards featuring Joe Camel near schools, and printed Joe Camel shirts, hats, and other paraphernalia, ensuring the campaign would be carried far and wide, and that kids would constantly be exposed to it. Only three years after the campaign began, in 1991, the Journal of the American Medical Association published a study showing that by age six nearly as many children could correctly respond that "Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting children, despite R. J. Reynolds' claim (similar to the claim of Defendants here) that the campaign was directed only to adults who were already smokers of other brands.66 At that time researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were Camels.67 Ultimately, the Joe Camel campaign ended as part of a landmark settlement in 1997.68

168.     Cigarette companies have also known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth Cigarette – New Concepts stated, "it's a well known fact that teenagers like sweet products."69 A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.70 A 2008 study found that 17-year-old smokers were

66 Paul M. Fischer *et al.*, *Brand Logo Recognition by Children Aged 3 to 6 Years* (Dec 11, 1991), JAMA 266(22):3145-8, *available at* www.ncbi.nlm.nih.gov/pubmed/1956101 (as of December 9, 2019).

67 Joseph R. DiFranza *et al.*, *RJR Nabisco's cartoon camel promotes camel cigarettes to children* (Dec 11, 1991) JAMA 266(22):3149-53, *available at* www.ncbi.nlm.nih.gov/pubmed/1956102 (as of December 9, 2019). (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.)

68 Stuart Elliott, *Joe Camel, a Giant in Tobacco Marketing, Is Dead at 23* (July 11, 1997), The New York Times,
https://www.nytimes.com/1997/07/11/business/joe-camel-a-giant-in-tobacco-marketing-is-dead-at-23.html (as of December 9, 2019).

69 Tobacco Industry Quotes on Nicotine Addiction, Brown & Williamson official A.J. Mellman, 1983, https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addiction.pdf (as of December 9, 2019).

70 *Flavored Tobacco Fact Sheet*, Students Working Against Tobacco, (*citing*, Sedgefield Idea Sessions

more than three times as likely as those over the age of 25 to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.71 Cigarette companies also used advertisements that paired cigarettes with foods, to make it seem like cigarettes were part of a healthy meal.

### 3.    Because Advertising Fuels Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors

169.    Most of the activities described in the section above are now recognized as against public policy, and thus forbidden for cigarette companies.

170.    Under the Tobacco Master Settlement Agreement ("MSA"), reached in 1998, participating manufacturers agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." MSA, § III(a). They are also prohibited from

a.    using outdoor advertising such as billboards,

b.    sponsoring events,

c.    giving free samples,

d.    paying any person "to use, display, make reference to, or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media," which includes "any motion picture, television show, theatrical production or other live performance," and any "commercial film or video,"; and

e.    paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

171.    In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. Then-FDA commissioner

---

790606-790607. June 8, 1979. Bates No. 81513681/3691),
http://swatflorida.com/uploads/fightresource/FlavoredTobaccoFactSheet.pdf  (as of December 9, 2019)
71 Sarah M. Klein *et al.*, *Use of flavored cigarettes among older adolescent and adult smokers: United States, 2004-2005*, (Jul 2008) Nicotine Tob Res. 10(7):1209-14,
https://www.ncbi.nlm.nih.gov/pubmed/18629731 (as of December 9, 2019).

Dr. Margaret A. Hamburg announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."72

172.    The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

173.    A study of the cigarette flavor ban in 2017 found that the flavor ban was effective in lowering the number of smokers and the amount smoked by smokers, but also was associated with an increased use of menthol cigarettes.73 The same study reported that 85% of adolescents who use e-cigarettes use flavored varieties.

### 4.    JLI's Marketing Leveraged Banned Strategies Perfected by Cigarette Companies to Induce Minors and Young Non-Smokers to Purchase JUUL products

174.    Following the successful model of its predecessors, since 2015, JLI, in conjunction and in concert with Altria has been operating a long-term viral marketing campaign aimed at teenagers and young adults. This campaign extends and expands upon deceptive advertising tropes used by tobacco companies to exploit the psychological needs of consumers—especially youth—to convert them into smokers.

   

175.    JLI's admitted reliance on tobacco industry documents is apparent in a collection of JUUL advertisements compared to historical cigarette advertisements on Stanford's Research into Impact of Tobacco Advertising ("SRITA") website. The side-by-side comparison of numerous

---

72 Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth* (Sept. 22, 2009), The New York Times, www.nytimes.com/2009/09/23/health/policy/23fda.html (as of December 9, 2019).

73 Charles J. Courtemanche *et al.*, *Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use* (May 2017), Am J Prev Med 52(5):e139-e146, *www.ncbi.nlm.nih.gov/pubmed/28081999* (as of December 9, 2019)

JUUL advertisements shows that its imagery directly parallels that adopted by cigarette manufacturers, including imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.

176.    Because of social media, JLI has been able to operate an even more pervasive, insidious, and successful viral marketing campaign than its predecessors in this industry. As set forth below, JLI developed and oversaw a long-term viral marketing campaign with the intent to convince young people to purchase its products. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

177.    JLI carried this campaign out by: (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth.

178.    JUUL's advertisements consistently withheld material information about the dangers of the product. Through this long-term advertising campaign, the JUUL DEFENDANTS were able to persuade consumers, and in particular teenagers and young adults that its product was cool, while hiding from them the dangers associated with using the product. And because of the viral nature of JUUL's marketing, JUUL promotions continue to reach youth, despite JUUL's deactivation of its social media accounts.

### 5.    JUUL Advertising Used Imagery that Exploited Young People's Psychological Vulnerabilities.

179.    Throughout the relevant period, JLI ran a consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of an

adolescent's future self) while failing to adequately and conspicuously disclose the nature or risks of the products.

180. In designing the campaign, JLI knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate an emotional response that would resonate with teenagers, and obscure the fact that the product was unsafe and addictive.

181. To help it design these ads, JLI relied on various social media marketing companies. In 2015, JLI worked with Cult Collective, instructing Cult Collective to design an ad campaign that would catch fire and reach customers who had "heard it all before." At the time, JLI was a young company, competing with bigger, more established companies with large advertising budgets and high brand loyalty. The solution JLI and Cult Collective reached was to position JUUL as a modern product that represented a better way of life for young people. That campaign was highly effective.

### 6. JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers.

182. To announce the JUUL's release in June 2015, JLI launched the "Vaporized" advertising campaign that was aimed at a youth audience. 74 The campaign used young, stylish models, bold colors, and memorable imagery. The models were often using hand gestures or poses that mimicked teenagers.



---

74 Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (Jun 23, 2015) AdAge, http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (as of December 9, 2019).

183. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

184. The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool." This Vaporized campaign targeted youth using the exact template established by the cigarette companies, decades earlier.

185. Often the Vaporized ads contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest generation of cool products, like iPhones and MacBooks.

186. The color scheme chosen was similar to colors used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers.

187. As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers."75

188. As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times Square.



---

75 Robert K. Jackler *et al.*, *JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising*, Stanford University School of Medicine (Jan 31, 2019), (*citing* Cult Creative JUUL case study. http://cultideas.com/case-study/juul (last accessed September 21, 2018), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (as of December 9, 2019).

189.    Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement reached between 46 states' attorneys general and cigarette companies, but JUUL took advantage of that agreement's failure to foresee the rise of vaping products to advertise its nicotine products in a manner that had already been deemed against public policy for other nicotine products.

190.    To ensure that its message would spread, JLI utilized several other tools to put its product in front of young people. First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue. Notably, Vice bills itself as the "#1 youth media brand" in the world and is known for running edgy content that appeal to youth. JLI also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers. Again, this is an activity which would have been prohibited by law for a cigarette company on the ground that it was against public policy.



191.    JLI's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product."[76] This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously addicted cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term negative consequences, to

_____

76 Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (Jun 23, 2015) AdAge, http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (as of December 9, 2019).

position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to introduce youth to the "illicit pleasure" of using the JUUL products.77

192.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter. The Vaporized campaign included the largest ENDS smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year and generated over 400 unique promotions.

193.    JLI also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, carried significant health risks or was addictive. Instead, the promised attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a long-standing practice for tobacco companies, but is now forbidden.

194.    John Schachter, director of state communications for Campaign for Tobacco-Free Kids, expressed "concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."78

195.    To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, if the same ads had been touting cigarettes, they would have been required to display a health warning in high contrast black and white in a box comprising 30% of the image.

---

77 Additional images and videos are available at
*http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php* (as of December 9, 2019).
78 Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (Jun 23, 2015) AdAge, http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (as of December 9, 2019).

### 7.      **JLI Gave Away Free Products to Get New Consumers Hooked**

196.      JLI distributed free starter packs at the live social events described above—conduct forbidden for a cigarette company under the Tobacco Master Settlement Agreement, because it lured young people into nicotine addiction and related harms. BeCore, one of the firms responsible for designing and implementing JUUL's live events reported that "on average, BeCore exceeded the sampling goals set by JUUL . . . average number of samples/event distributed equals 5,000+."[79] At these events, BeCore distributed the appropriately-named JUUL "Starter Kits," which contain a JUUL and 4 JUULpods of varying flavors. If BeCore indeed gave away 5,000 Starter Kits per event, JLI effectively distributed the nicotine equivalent of 20,000 packs of cigarettes at each of the 25 events described above—or the equivalent of 500,000 packs of cigarettes at all 25 events.



---

79  Robert K. Jackler *et al.*,  *JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising*, Stanford University School of Medicine (Jan 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (as of December 9, 2019).

197.    Though JLI publicly acknowledged in October 2017 that it is unlawful to free samples of its products at live events, it continued to do so, sometimes through $1 "demo events." Notably, promotions of this kind are prohibited for cigarette companies by the MSA.

198.    The effect—and purpose—of JUUL's Vaporized giveaways was to flood major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media. Similar campaigns have long been used by drug cartels. This campaign unconscionably flooded cities with free samples of an addictive product, with distribution focusing on the youth market. As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, like DENIS N. BYRNE, JR., who used the products, became addicted to nicotine and suffered severe health consequences.

### 8.    JLI Portrayed Its Products as Status Symbols.

199.    As tobacco companies have long known, young people—and adolescents in particular—find security and a sense of identity in status symbols. Even after the "Vaporized" campaign, JUUL's later advertisements mimicked the look and feel of the "Vaporized" ads to foster the image of JUUL e-cigarettes and JUULpods as sleek, stylish, status symbol. For example, JLI developed and ran a series of advertisements that were simple images of stylish young people using JUUL.

200.    All of these ads communicated to teenagers that JUUL and vaping was used by cool, modern young people, which JLI, like all cigarette companies, knows is a powerful message. None of these ads prominently disclosed the dangers of using JUUL or vaping.

201.    Other JUUL advertisements relied on graphic images with the look and feel of advertisements by Apple, Google, and similar tech companies with progressive and modern reputations. Again, these ads resonated with teenagers as well, as they made JUUL, and especially the flavored pods, look like cool gadgets or software, something akin to an iPhone or a hot new app to download. Like the other ads, none prominently disclosed the dangers of using JUUL.

202.    JLI also consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JLI posted on its website, distributed through social media, and disseminated through its email campaign. The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition. JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.

203.    Beyond triggering an emotional response in teenagers, all of JUUL's social media advertising had three additional things in common. First, through the use of clean lines, artistic arrangements, minimal text, and eye-catching graphics, JLI ensured that the advertisements would jump out to distracted teenagers who scrolled crowded social media pages on their phones and browsers.

204.    Second, all of JUUL's advertisements reflect an understanding that social media users in general, and teenagers in particular, do not typically read long blocks of text on social media, and rely more heavily on imagery instead of text to convey a message. Many of the ads did not include any warning about the dangers of JUUL or suggest to teenagers that the product contained nicotine.

205.    Moreover, where JUUL's advertisements appeared to contain such a disclaimer, this disclaimer was not typically seen when viewing social media due to the way the posts appear in phones and browsers. In particular, Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest.

206.    JUUL's Instagram advertisements obscure those nicotine warnings by placing them in a location that requires the user to open up the post and read it. As can be seen in JUUL's Instagram ads, the company consistently used brief text at the beginning of a post so that it would to be a complete sentence with no further content. Thus, the disclaimer was never visible to anyone viewing the posts in their main feed, and it was only seen by a limited number of people who

FILED: BRONX COUNTY CLERK 09/28/2021 01:13 PM
Case 1:21-cv-09110-JPC Document 1-1 Filed 11/03/21 Page 55 of 117

elected to open the post and then read what was there. Notably, on Twitter, a Social Media Platform that is geared towards reading text, and on Facebook, where some users do read text, JUUL typically did not include the disclaimer in its advertisements.

207. Third, JUUL's advertisements were typically creative, giving them the look and feel of "art." Thus, teenagers were drawn to the advertisements, holding their gaze on the ads for longer periods of time, and being more inclined to share the advertisement with others in their networks, thus accomplishing JLI's goal: turning consumers into salespeople.

208. Even JUUL's newer "alternative for adult smokers" tagline suggests to adolescents that JUUL-use is a symbol of status as an adult, which happens to be an advertising theme cigarette companies peddled to youth for decades.

### 9. JLI Used Flavors and Food Imagery to Attract Teenagers and Downplay Risks

209. JLI sells its JUULpods in a variety of sweetened flavors. It even advertised some of its flavors as though they were desserts in themselves. For example, it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." JUUL used imagery that looked like ads for a trendy coffee shop or restaurant.



210. Again, none of these advertisements prominently disclosed that JUUL was addictive and unsafe.

211. The tobacco industry has long known that sweetened cigarettes attracted young smokers. As discussed above, the FDA banned flavored cigarettes for that reason.

212.    The use of flavors that appeal to youth has a marked effect on e-cigarette adoption by young "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month.

213.    Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[80] Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found."[81]

214.    Research also shows that when youth see flavored ENDS liquids advertisements, they believe the advertisements and products are intended for them.[82]

215.    The use of attractive flavors foreseeably increases the risk of nicotine addiction, and e-cigarette related injuries, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction.[83] Worse still, adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was tobacco-flavored.

216.    JUUL's kid-friendly flavors included Mango, "Cool" Mint, and Menthol. 74% of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod.[84]

---

80  Bridget Ambrose *et al.*, *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014* (Oct 26, 2015), JAMA 314(17):1871-1873, *available at*
https://jamanetwork.com/journals/jama/fullarticle/2464690 (as of December 9, 2019)

81  Brian A. Primack *et al.*, *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults* (Apr 2018), The American Journal of Medicine, Vol. 131, Issue 4, 443.e1–443.e9, *available at* www.amjmed.com/article/S0002-9343(17)31185-3/fulltext (as of December 9, 2019)

82  Karma McKelvey *et al.*, *Youth say ads for flavored e-liquids are for them* (Aug 29, 2018), Addict Behav. 91:164-170, *available at* www.ncbi.nlm.nih.gov/pubmed/30314868 (as of December 9, 2019)

83  How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010) *www.ncbi.nlm.nih.gov/books/NBK53017/* (as of July 5th, 2019).

84  Karma McKelvey *et al.*, *Adolescents and young adults use in perceptions of pod-based electronics cigarettes* (Oct 19, 2018), JAMA Netw Open. 1(6): e183535, *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC6324423/ (as of December 9, 2019).

More than half of teens in a nationwide survey by the Wall Street Journal stated that they use ENDS because they like the flavors.

217.    When JLI released what are now the two most popular flavors among youth: Mango and "Cool" Mint ("Cool Mint"), it promoted those flavors on Instagram, Twitter, YouTube and Facebook—all of which are skewed toward young audiences.

218.    JUUL's Mango pods quickly became the runaway favorite among youth. The Mango pods are so popular that, incredibly, they noticeably increased the use of the word "mango" on the internet as a whole. Starting in early 2017, Google Trends reports a nearly five percent increase in year-over-year use of the word "mango" online.85    DENNIS N. BYRNE, JR's preferred JUUL flavor was Mango.

219.    "Cool" Mint became youths' second youth favorite flavor. The 2018 Duell Study found 94 mg/mL nicotine in a JUUL "Cool" Mint pod – nearly double the amount on JUUL's "5% strength" label would suggest.

220.    JUUL's advertising emphasized the flavors of its sweetened nicotine pods. Leveraging the flavors, Defendants advertised JUULpods as part of a meal, to be paired with other foods. In late 2015, JLI began a food-based advertising campaign called "Save Room for JUUL." A play on the expression "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, and pairing them with foods. JUUL described its crème brulee nicotine pods as "the perfect evening treat," using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."

221.    Fruit Medley pods were similarly promoted using images of ripe berries. JUUL described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint," and in a Facebook advertisement dated July 10, 2017, JUUL urged customers to "start your week with cool mint

---

85  *https://trends.google.com/trends/explore?date=2014-06-01%202018-12-05&geo=US&q=mango*

juulpods." Along with the bright green caps of the "Cool" Mint JUULpods, the Facebook ad included an image of a latte and an iPad.

222.   JLI even hired celebrity chefs to provide pairing suggestions for JUUL flavors. On Instagram and Twitter, JUUL boasted about "featured chef" Bobby Hellen creating a "seasonal recipe to pair with our bruule pod." On Facebook, JUUL posted a link to an article on porhomme.com about "what our featured chefs created to pair with our pod flavors." JUUL tweeted repeatedly about its flavors and encouraged its social media followers to share their preferred pairings.



223.   In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture. JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee. This comparison to coffee was an intentional effort to downplay and minimize the risks of JUUL, suggesting it was no more risky than coffee.

224.   By positioning JUULpods as a delicious treat rather than a system for delivering a highly addictive drug with dangerous side effects, consumers were unfairly led to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

225.   By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, the JUUL

DEFENDANTS conditioned viewers of these advertisements to associate JUUL with those foods. Through this conditioning process, these Defendants sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based physiological arousal including increased salivation and heart rate. These physiological responses, in turn, would make JUUL use more appealing.

226.    By 2017, JLI knew that the foreseeable risks posed by fruit and candy-flavored e-liquids had materialized. A significant percentage of JUUL's customers included adolescents who overwhelmingly preferred Fruit Medley and Crème Brulee over Tobacco or Menthol.[86] Instead of taking corrective action or withdrawing the sweet flavors, JLI capitalized on youth enthusiasm for its products.

227.    JLI disingenuously asserts that it did not intend its flavors to appeal to young people, including DENIS N. BYRNE, JR.. After 11 senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and Mango, JLI visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Sen. Dick Durbin (D-Ill.). JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

228.    In response to litigation and other mounting public pressures, JLI stopped selling fruit and dessert-flavored pods, and announced it would stop selling mint-pods. Nonetheless, these moves come too late as underage vaping had already reached epidemic levels.[87]

---

86  Truth Initiative, *JUUL fails to remove all of youth's favorite flavors from stores* (Nov 15, 2018), https://truthinitiative.org/research-resources/emerging-tobacco-products/juul-fails-remove-all-youths-favo rite-flavors-stores (as of December 9, 2019).

87  Associated Press, *Juul stops selling mint-flavored vape pods in U.S., keeps menthol*, Los Angeles Times (Nov. 7, 2019),
https://www.latimes.com/business/story/2019-11-07/juul-stops-selling-mint-flavored-vape-pods-in-u-s (as of December 9, 2019).

10.    **JLI Developed Point-of-Sale Advertising That Emphasized the
       Products' Positive Image Without Adequately Disclosing Its Nature
       and Risks.**

229.    The cigarette industry spends $8.6 billion a year in point-of-sale ("POS")

promotions—or almost $990,000 every hour. 88 In a 2009 study of adult daily smokers,

unintended cigarette purchases were made by 22 percent of study participants, and POS displays

caused nearly four times as many unplanned purchases as planned purchases. 89 Younger

smokers, in particular, are more likely to make unplanned tobacco purchases in the presence of

POS advertising.90

230.    Studies show that tobacco use is associated with exposure to retail advertising and

relative ease of in-store access to tobacco products. Some studies have shown that youth who were

frequently exposed to POS tobacco marketing were twice as likely to try or initiate smoking than

those who were not as frequently exposed. Frequent exposure to tobacco product advertising and

marketing at retail normalizes tobacco and smoking for youth over time and makes them more

likely to smoke. POS marketing is also associated with youth brand preference. Research shows

that young adult smokers prefer the tobacco brands marketed most heavily in the convenience

store closest to their schools.  Before its launch in 2015, JLI and Cult Collective developed

innovative packaging and creative in-store displays that would carry their message through into

stores.

231.    In particular, they designed bright, white packages. The packaging looked similar

to iPhone packaging, which JLI knew would resonate with young people, and because it was solid

white, the packaging stood out and caught people's eyes when displayed in store shelves. This

packaging buttresses Defendants' online marketing of JUUL e-cigarette as "the i-Phone of Ecigs,"

thereby framing them as a cool, fashionable item to own and use. JUUL posters and signs at the

point of sale also promoted JUUL's flavors. From 2015 through late 2018, JLI promoted JUUL

---

88 Truth Initiative, *The Truth About Tobacco Industry Retail Practices,*
https://truthinitiative.org/sites/default/files/media/files/2019/03/Point-of-Sale-2017_0.pdf  (as of
December 9, 2019)
89 *Id.* at 4.
90 *Id.*

products and JUUL flavors at the point of sale without disclosing that the products contained nicotine or warning that the products could lead to addiction. Instead, JUUL's promotions displayed the colorful JUULpod caps and their food-based names while omitting that JUUL delivers nicotine, is addictive, carries risks of stroke and other cardiovascular events.



232.    For many, JUUL's POS materials provided an introduction to the brand. Because JUUL's POS materials omitted the most material features of JUUL's product—that it is a powerfully addictive nicotine delivery system—young people who saw JUUL's POS and were later offered a JUUL would have no reason to think that what they were being offered JUUL contained nicotine, or posed risks of addiction, or was unsafe.

### 11.    JLI Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products

233.    JLI not only designed its advertising with an eye to what might be appealing to young people, but set about disseminating those ads to ensure that young people see them. JLI set out to advertise on at least three major social media platforms: Instagram, Facebook, and Twitter, and disseminated the information in various ways across the platforms.

234.    On information and belief, JLI maintains active accounts on most social media platforms, including Instagram, Facebook, and Twitter, where it tweeted nearly 5,000 times in 2017 alone. As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of

teens use Facebook, and 44 percent of teens use Twitter.91 While JLI continues to maintain its Twitter page, it deleted nearly all content from its Instagram and Facebook pages around November of 2018, in response to lawsuits.

235.    JLI was able to deliver content directly on social media using two approaches. First, it could post its advertisements directly to its own page, where it would be viewed by those who followed JUUL, and those who shared its posts ("Unpaid Advertising"). And it could engage in paid advertising, whereby it could target specific demographics of people to ensure they received its advertisements ("Paid Advertising").

236.    With respect to Unpaid Advertising, Instagram was the centerpiece of JUUL's teen-focused advertising blitz. Instagram is used overwhelmingly by teenagers. At least 72% of teenagers in the United States have an Instagram account, and at least 63% of teenagers between the ages of 13 and 17 use Instagram every day.92 While increasingly more adults are using Instagram, this has been a recent development, and thus, advertisers typically only use Instagram if they are interested in marketing to young people, especially teenagers.

237.    Because of the way Instagram delivers content, Instagram allowed for fast, effective delivery and sharing of its graphic, simple messages. Users would see these images simply by scrolling through their feeds.

238.    JLI also disseminated Unpaid Advertising across social media through its use of hashtags. Hashtags are simple phrases preceded by a #, and they operate as a way of cataloguing posts. Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks. On most social media platforms, users can find information by doing a

---

91 The Associated Press-NORC Center for Public Affairs Research, *Snapchat And Instagram Are Most Popular Social Media Platforms Among American Teens*,
http://apnorc.org/projects/Pages/HTML%20Reports/instagram-and-snapchat-are-most-popular-social-net works-for-teens.aspx (as of December 9, 2019)

92 Aaron Smith & Monica Anderson, Pew Research Center, *Social Media Use in 2018: A majority of Americans use Facebook and YouTube, but young adults are especially heavy users of Snapchat and Instagram* (Mar 1, 2018), www.pewinternet.org/2018/03/01/social-media-use-in-2018/ (as of December 9, 2019).

search for a hashtag with that key word. Thus, people interested in JUUL, could enter into the search bar on most Social Media Platforms "#JUUL" to find posts that include that hashtag. Instagram takes it one step farther and allows users to set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.

239.    JUUL's hashtag marketing played a central role in the viral spread of JUUL and vaping between teenagers. The use of hashtags in social media advertisements "can be used to get your content in front of a bigger audience, raise awareness about your brand, target a very specific group of people, boost your SEO, and use hot trends and topics to your advantage. *See* Olivia Ryan, *Hashtag Marketing: How to Use Hashtags for Better Marketing Campaigns*, Mention, https://mention.com/blog/hashtag-marketing-how-to-use-hashtags-for-better-marketing-campaigns/ (as of December 9, 2019). Hashtags are "the best weapon in your arsenal, aside from influencer marketing" for getting content "in front of its intended audience." *Id*. Through hashtag marketing, brands can Join in on trending topics, engaging "an insane amount of readers" by using "hashtags which aren't closely related to your industry" by, e.g., using holiday-related hashtags. *Id.* By using "branded hashtags" that include the company's name or a specific product, advertisers can monitor the performance of specific campaigns. Another advantage of branded hashtags is user-generated content: "Every time a user puts one of your branded hashtags inside one of their posts, they are increasing your presence on social media" by promoting the branded hashtag, and the related content, to the user's followers. *Id.* Through successful hashtag marketing campaign, brands can create communities through which "followers will not only be able to communicate via chat or messages, but also connect with each other by using your hashtag." *Id.*

240.    From 2015 through 2018, JLI used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products. In various posts, JUUL would slip in hashtags so that their posts would be found by young people. This post is not a paid advertisement, but a post to JUUL's Instagram feed. JUUL used #TBT, which is an acronym for "Throwback Thursday." Throwback Thursday is a popular meme on social media, and teenagers are especially likely to understand it and use it. Thus, any teenager who had elected to follow the hashtag TBT would see

this post when they logged into Instagram that day. Moreover, no one would see any warning regarding nicotine unless they actually opened the post. JUUL frequently used other hashtags that would be used by teenagers to push their product to them across social media, such as #icymi ("in case you missed it").

241. JUUL also used hashtags to convert young users into salespersons through unpaid viral marketing.

242. In disseminating Paid Advertising, the Social Media Platforms allow companies like JUUL to engage in micro-targeting, i.e., to select precisely what demographics of people should be exposed to its advertising. Social Media Platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power. When advertisers pay to disseminate ads, they can choose to target those ads so that they are received only by people whose digital footprint suggests an interest or predisposition to the product. JUUL would have had the option to exclude teenagers. It also could have elected to narrow its target audience to people with an interest in tobacco products, if it wanted to reach and convert non-smokers. Or it could target a broader audience of people whose digital footprints did not reveal that they were smokers.

243. While the precise targeting methods are unknown, on information and belief, young people like DENIS N. BYRNE, JR. were known to have been exposed to JUUL's Paid Advertising while on social media, suggesting that JLI did not narrow its target audience to adult smokers.

244. Moreover, regardless of to whom the JUUL DEFENDANTS' targeted paid advertisements to, JUUL's use of Paid Advertising was aggressive, and had the inevitable result of reaching teenagers, including DENIS N. BYRNE, JR. Paid advertising can be shared and liked just as Unpaid Advertising. JUUL relentlessly advertised to its targeted audience, across all Social Media Platforms. DENIS N. BYRNE, JR. was exposed to JUUL advertising, regardless of what platform he used. The continual use of Paid Advertising increased the pressure to buy, and it has

made it quitting harder due to the fact that he is exposed to the advertising frequently through his phone and other personal electronic devices.

### 12.    JLI Exploited Social Media to Target Young People

245.    To broaden the reach of its campaign, JLI used "influencers" to push the product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings – i.e., the "cool kids" of the social media world. People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and because they are known to be trend-setters.

246.    Viewed as tastemakers and trendsetters by their followers, influencers are prized sources of brand promotion on social media networks. Companies seeking to market products often will pay influencers to advertise their products, similar to the ways in which they utilize "product placement" in movies. They seek out influencers with large amounts of followers in their target demographic and will offer these influencers money or other deals to promote their products. The influencer then will create various posts on social media using the product. Typically, these posts are images of them using the product, but sometimes these posts will include videos, longer written reviews, or other information about the product. Influencers often include in these posts company-endorsed hashtags or links to the company's website to try to direct their followers to learn more. The company gets the benefit of having word-of-mouth advertising, and the influencer is able to attract more followers because those followers want to stay in the loop about new products and deals. While influencers operate on all Social Media Platforms, most of them rely primarily on Instagram.

247.    JLI relied on influencers to carry out its viral marketing campaign. JLI's reliance on influencers appears to have begun around June 2015, when JLI listed a position on its website for a three-month Influencer Marketing Intern. [93] JLI described the position as follows: "The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer

---

[93] *https://www.internships.com/marketing/influencer-marketing-intern-i7391759* (last accessed Nov 14, 2018).

engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc."94 JLI's efforts to solicit influencers appears to have been underway for years; until December 2018, JUUL's website still called for individuals to "Join the JUUL influencers." Applicants were required to disclose their profile information for Instagram, Twitter, and Facebook, as well as various other blog and vlog platforms, suggesting that JUUL was interested in understanding whether the influencers could help JUUL reach its targeted youth demographic.

248. JLI's outreach had its desired impact, as it was able to line up influencers to promote its products to teenagers, while spreading pictures of cool, young people using JUUL. In addition to all the means above, JLI paid influencers and celebrities to promote JUUL, generating even more attention and exposure to young people, and reinforcing that the products were safe, cool, and fun.

249. JLI used or ratified multiple accounts across many social media sites to reach young people, even encouraging users to JUUL at school.

250. JLI also enjoyed the benefit of third-party promoters who reached hundreds of thousands of young people.

251. JLI allowed third parties, like @JUULnation to use its trademark. @JUULnation's Instagram post included tips on how to conceal JUUL in school supplies and ridiculed efforts to combat JUUL use among young people. JLI promoted @JUULnation on its own Instagram account.

252. Cigarette companies are prohibited from conducting any of the practices described above under the Tobacco Master Settlement Agreement. Activities such as product placement in performances and professional videos have been identified as against public policy for nicotine products.

---

94 *Id.*

253.    One recent study concluded that JUUL was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . because there are no restrictions," on social media advertising. 95

**13.    JLI Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth Without Disclosing Harms.**

254.    Cigarette companies for years sold youth-brand cigarettes at lower prices that young smokers could afford and used discounts and other promotions to ensnare them. JUUL is no different. It not only designed a marketing campaign to reach young people and entice new smokers, but it priced its products in such a way to ensure they would buy them.

255.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13-$20. JUUL's website charges $15.99 for a pack of JUULpods, or about $4 per JUULpod. By contrast, a single pack of cigarettes in Connecticut costs approximately $9, and $13 in New York.

256.    JLL partnered with large distributors who historically distributed tobacco products. For example, Defendant MCLANE is a wholly owned subsidiary of Berkshire Hathaway[96] with an annual revenue of approximately $50 billion.[97]   MCLANE provides wholesale distribution services in all 50 states to customers that include convenience stores, discount retailers, wholesale clubs, drug stores, military bases, quick service restaurants and casual dining restaurants. MCLANE maintains a dominant market share within the convenience store industry and serves most of the national convenience store chains, providing products to approximately 50,000 retail locations nationwide.[98] MCLANE has served as one of the largest tobacco

---

95  Laura Kelley, *JUUL Sales Among Young People Fueled by Social Media, Says Study* (Jun 4, 2018), The Washington Times,
www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/ (as of December 9, 2019).

96  https://www.mclaneco.com/content/mclaneco/en/home.html.

97  https://www.berkshirehathaway.com/2018ar/2018ar.pdf.

98  Berkshire Hathaway 10-K at K-18.

distributors in the United States for the Cigarette Industry giants such as Defendant ALTRIA and R.J. Reynolds.[99, 100] MCLANE is the largest wholesale distributor for ALTRIA, accounting for approximately 27%, 26% and 25% of ALTRIAS' consolidated net revenues for the years ended December 31, 2018, 2017 and 2016, respectively.

257.   Similarly, CORE-MARK is one of the largest wholesale distributors to the convenience retail industry in North America, providing sales, marketing, distribution and logistics services to approximately 43,000 customer locations across the United States ("U.S.") and Canada.[101] CORE-MARK posted an annual revenue of over $16 billion in 2018.[102]

258.   EBY BROWN is the largest privately-owned tobacco, candy and convenience store distributor in the United States. The company services over 14,500 stores around the United States.

259.   The DISTRIBUTOR DEFENDANTS were necessary partners to elevate the JUUL market and ensure that the JUUL DEFENDANTS' false and deceptive marketing campaign had a wide reach. Distributors already had the existing infrastructure to widely push JUUL products to a massive audience serviced by their existing customers.

260.   By the time JUUL launched in 2015, cigarette consumption had been steadily declining for over a decade. Based on data compiled from the U.S. Department of Agriculture - Economic Research Service and provided by the Tobacco Merchants Association ("TMA"), total cigarette consumption in the U.S. declined from 351 billion cigarettes in 2008 to 249 billion cigarettes in 2017, or a compounded annual decline of approximately 3.4%.[103] An entire industry

---

99 "The largest customer of PM USA, USSTC, Middleton and Nat Sherman, MCLANE COMPANY, Inc., accounted for approximately 27%, 26% and 25% of ALTRIA's consolidated net revenues for the years ended December 31, 2018, 2017 and 2016, respectively." http://www.snl.com/Cache/c396883765.html

100 https://seekingalpha.com/filing/2987262

101 CORE-MARK 2018 10-K at 1.

102 *Id.* at 3.

103 *Id.* at 2.

including the Cigarette Industry Distributors had depended on lucrative cigarette sales for decades.

261. The entire Cigarette Industry was hurting. Indeed, as announced in CORE-MARK's 2018 Annual Report, a slow-down in tobacco sales was affecting the major tobacco Distributors' bottom line.[104]

262. Capitalizing on the void left by a slow-down in cigarette sales, JLI approached MCLANE, CORE-MARK and EBY BROWN and convinced them that one of the ways to plug their financial hole was to join JLI in growing the JUUL market.

263. This could be accomplished by plugging the JUUL products into the Cigarette Industry marketing and distribution model that had been so successful for decades.

264. The proposal was attractive to the DISTRIBUTOR DEFENDANTS as they could use JUUL to assuage investors that the void created by declining cigarette sales could be filled. For example, in 2018, CORE-MARK assured investors that "a greater decline in total cigarette consumption has been partially offset by consumption of alternative nicotine products and OTP."[105] CORE-MARK detailed how selling e-cigarettes would fill a financial void for the company for years to come stating that "[a]lthough we anticipate overall cigarette consumption will continue to decline, we expect to offset these declines through continued growth in our non-cigarette categories including alternative nicotine products and OTP, market share expansion and incremental gross profit from cigarette manufacturer price increases."[106]

265. Starting in 2016, each of the DISTRIBUTOR DEFENDANTS committed to joining with JUUL DEFENDANTS to elevate the JUUL market. That was accomplished by JUUL DEFENDANTS and the DISTRIUBUTOR DEFENDANTS by pushing JUUL DEFENDANTS' dangerous products which were designed for and aimed at youth to its partners,

---

104 *Id.* at 1 ("The rate of growth in our net sales was lower than what we experienced the last several years due primarily to an acceleration of the decline of cigarette carton sales as well as fewer significant retail chains bidding their business in 2018.").

105 *Id.* at 4.

106 *Id.*

and through them to the ultimate customers. It was accomplished by ensuring that JUUL DEFENDANTS' false deceptive and dangerous marketing campaign was pushed a wide swath of customers across the United States.

266.    Indeed, the DISTRBUTOR DEFENDANTS, became an essential piece of the supply chain to push products to millions of customers around the United States, including to youth customers and illegally to minors.

267.    Even though the DISTRBUTOR DEFENDANTS knew that the JUUL vaping Products contained nicotine, from at least 2016 to 2018, the DISTRIBUTOR DEFENDANTS and the JUUL DEFENDANTS worked to sell JUUL products that neither disclosed the products' nicotine content, nor any of its risks.

268.    The DISTRIBUTOR DEFENDANTS and the JUUL DEFENDANTS knowingly pushed a product designed for a youth market to a massive consumer audience that should never have been marketed and sold to youth. They did so through devising and coordinating a campaign that would ensure the JUUL DEFENDANTS' false and deceptive marketing campaign reached millions of customers across America.

269.    To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL, the JUUL DEFENDANTS instructed retailers to display the product in an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, the JUUL DEFENDANTS designed display cases that would sit on store shelves. JLI intentionally designed the clear display cases so that the bright white, sleek packaging and the flavors would catch consumers' eyes and make them interested in purchasing the product.

270.    The JUUL DEFENDANTS knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was safer than traditional cigarettes and that it was not an addictive drug.

### 14. JLI Used Non-Age-Restricted Emails to Promote and Track Its Products

271.    Between 2015 and 2018, JLI sent around 200 email promotions to customers and potential customers. JLI's email subscription list was not age-restricted and, until recently, users who failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit. The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs. The emails also promoted JUUL's find-a-store locator.

272.    JLI also used emails to distribute surveys. Because JUUL's emails were not age-restricted, neither were their surveys. On information and belief, JLI thus collected data from minors. JLI paid customers, including youth, up to $30 to complete some surveys.

### 15. JLI Knew that its Scheme to Attract Young Smokers Like DENIS N. BYRNE, JR. had Worked

273.    Within a few months of the JUUL's commercial release in June 2015, a former JUUL executive reportedly told the New York Times that JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[107]

274.    JLI tracked and closely monitored usage among youth through social media, online surveys, YouTube videos, hashtags, likes, email lists, and myriad other sources.

275.    By the end of 2015, young people had posted tens of thousands of videos on YouTube demonstrating ways to "JUUL in school" and in other locations without teachers, coaches or parents finding out.

276.    From the outset, JLI was well-aware that a huge portion of its sales was going to persons like DENIS N. BYRNE, JR., but did nothing to curb, prevent, or mitigate the harms that its products could cause.

---

107 Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth* (Aug 27, 2018), The New York Times, www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (as of December 9, 2019).

## I.   Defendants Created a Youth Vaping Epidemic and Exposed a New Generation to the Dangers of Nicotine Products.

277.   Since its launch, JUUL is now the fastest growing e-cigarette in the country. Because the JUUL delivers more nicotine in a shorter amount of time than any other product, delivers that nicotine in a sweetened vapor that causes no irritation, and does so through a concealable device that can be consumed discretely in class, at home, and in the car, nicotine naïve users like DENIS N. BYRNE, JR. frequently spiral into patterns of addiction with no historical precedent. It is not uncommon for teenagers, like DENIS N. BYRNE, JR., to consume one whole pack of JUULpods per week, or even as many as one or more individual JUULpods per day, the nicotine equivalent of at least as many—and likely more—packs of cigarettes.

278.   Because JUUL's marketing turned the JUUL into a status symbol for teens, the acute nicotine addiction a JUUL fosters is frequently reinforced by the idea—which JUUL spread—that JUUL use is what "cool" popular kids do in high school. As a result, the medical community has found itself ill-equipped to develop a treatment for JUUL-addicted youth, as evidenced by a January 2019 FDA-sponsored meeting concerning the role of drug therapies in treating e-cigarette use.

279.   The vaping epidemic has swept the entire nation in a short period of time. On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent Electronic Nicotine Delivery System ("ENDS") vaping from 2017 to 2018 were the "*largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S.*" 108

280.   The percentage of 12th grade students who reported vaping nicotine almost doubled between 2017 and 2018, rising from 11% to 21%. The ten-percentage-point increase in 12th grade students who reported vaping nicotine (an indicator of nicotine addiction) is "twice as

---

108 Nicholas Prieur, *National Adolescent Drug Trends in 2018* (Dec 17, 2018), Institute For Social Research, The University of Michigan, https://isr.umich.edu/news-events/news-releases/national-adolescent-drug-trends-in-2018/ (as of December 9, 2019).

large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade." *Id.* "One in five 12th graders vaped nicotine in the last 30 days in 2018." *Id.* And because JUUL controls over 50% of the e-cigarette market, and was released immediately prior to the jump in vaping prevalence from 11% of teens to 21%, the entire increase in vaping prevalence since 2016 is attributable to JUUL.

281. FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous – and dangerous – trend" that is responsible for an "epidemic" of nicotine use among teenagers. 109 The rapid –indeed infectious- adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."110 The Commissioner identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."111

282. Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."112

283. Even more troubling are the challenges associated with getting kids to quit JUUL once they start. JUUL's aggressive social media campaign puts JUUL advertisements before them every day, all day. Those that want to stop thinking about it are faced with advertising when engaging in their regular activities. And even while JLI has purportedly stopped advertising on social media in recent months, its hashtags, imagery, and impact live on.

---

109 *FDA launches new, comprehensive campaign to warn kids about the dangers of e-cigarette use as part of agency's Youth Tobacco Prevention Plan, amid evidence of sharply rising use among kids*, U.S. Food & Drug Administration, (Sep 18, 2018),
https://www.fda.gov/news-events/press-announcements/fda-launches-new-comprehensive-campaign-warn-kids-about-dangers-e-cigarette-use-part-agencys-youth (as of December 9, 2019)

110 *Id.*

111 *Id.*

112 *Surgeon General's Advisory on E-cigarette Use Among Youth* (last updated Apr 9, 2019), CDC, www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html *(as of* December 9, 2019).

284.   Moreover, many medications for breaking nicotine addictions are approved only for adults.

285.   The inadequacy of quality control and other standards in the manufacture of JUUL raises additional, serious public health concerns regarding youth access and use. For instance, actual nicotine concentrations in JUUL can vary from advertised amounts, sometimes significantly exceeding the advertised concentration of nicotine. Because the concentration of nicotine in JUULpods is already staggeringly high and potent, concentrations over the advertised amounts can increase the risk that users could become addicted or experience nicotine poisoning, or experience a spike in blood pressure which can result in serious illness or death. A related concern is the lack of full disclosure of all ingredients in e-liquids, some of which can also cause harm when inhaled.

### J.   Defendants Unraveled Decades of Progress in Reducing Teen Smoking by Exploiting Regulatory Loopholes.

286.   The teen vaping epidemic was by design, not by accident.

287.   When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices. Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JLI interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

288.   As other vaping companies began to enter the market, JLI no doubt knew that this gray area was unlikely to stay gray for long. Knowing that the clock was ticking, JLI and the other Defendants went on a wild spree to get as many young people addicted as possible while it still viewed itself as "unregulated." The aggressive advertising described above was designed not just to sell the products to teenagers, but to sell the product to as many teenagers as possible while it still had a plausible defense to any assertion that it was violating FDA regulations. By hooking teens, Defendants not only ensured it would have loyal consumers for decades, but those teens would influence their friends.

289.     Moreover, by pumping social media platforms full of images of cool, young people having fun while JUULing, the JUUL DEFENDANTS ensured that everyone from adults to young children, would think JUULing was a cool, fun, and safe activity. Just as RJR Reynolds learned with Joe Camel, even very young children would in turn be more likely to form strong, positive associations with the tobacco product and be more susceptible to trying it in the future.

290.     In 2017, the FDA announced that it would be taking steps to regulate vaping devices such as JUUL and other ENDS. Regulations were proposed and ultimately went into effect in late 2018, but the damage was already done.

B.      In 2018, after the FDA opened an investigation and lawsuits were filed, JLI set out to rewrite its history.  It has removed from its website and much of the internet images of glamorous young models seductively exhaling clouds of vapors.  JUUL's website now pictures middle-age adults in non-glamorous settings and suggests that JUUL solely exists for the benefit of adult smokers looking for an alternative.  Although Defendants now market the product as a smoking cessation device ("Switch to JUUL"), they have not yet received FDA approval as a modified risk tobacco product or as a nicotine replacement therapy, and have not participated in any FDA approval process analyzing its risks and benefits.  The viral marketing campaigns and images live on, the candy flavors are still available, and the products remain designed to maximize the nicotine delivery for young people, leading to devastating health consequences.

291.     To this day, JLI has not disclosed the health risks associated with its products or vaping, has not recalled or modified its products despite the known risks, and continue to foster a public health crisis, placing millions of young people in harm's way.

292.     DENIS N. BYRNE, JR. relied to his detriment on Defendants' representations that their products and vaping were safe and fun.

293.     Defendants never disclosed to DENIS N. BYRNE, JR. that JUUL and vaping was severely addictive, was manipulated to deliver massive doses of nicotine that could addict him quickly, affect the chemical balance in his brain, or cause severe pulmonary damage and death.

294.    Defendants never instructed DENIS N. BYRNE, JR. how much JUUL was safe to consume or that each JUULpod delivered substantially more nicotine than a pack of cigarettes.

295.    Defendants failed to provide adequate warnings to DENIS N. BYRNE, JR. that JUUL and vaping was dangerous, or could cause other severe health side effects.

296.    DENIS N. BYRNE, JR. did not have any physical or mental health concerns until he began vaping.

297.    As a result of Defendants' conduct, DENIS N. BYRNE, JR. was harmed directly and proximately by Defendants' defectively designed JUUL products as described herein. Such harm included severe respiratory injuries leading to his death.

298.    As a result of his injuries caused by JUUL, DENIS N. BYRNE, JR. prior to his death incurred pain, suffering and emotional distress.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Strict Liability- Design Defect

299.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

300.    At all relevant times, the JUUL DEFENDANTS AND THE E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL products that DENIS N. BYRNE, JR. consumed prior to his death from vaping related lung disease.

301.    JUUL was designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of e-liquid solution.

302.    JUUL as designed was unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons including the high delivery of nicotine, the inclusion of a multitude of other harmful ingredients, the likelihood of nicotine addiction and the

risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects.

303. The JUUL DEFENDANTS defectively designed their products to specifically appeal to minors and young adults, who were particularly unable to appreciate the risks.

304. The JUUL DEFENDANTS defectively designed JUUL with a pharmacokinetic profile engineered to create risks of abuse and addiction (that exceeded that of a cigarette) in that JUUL delivered more nicotine than cigarettes.

305. JUUL products contain and deliver more nicotine than is represented, are delivered by heat vaporization inhaled into the body, and contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

306. The JUUL DEFENDANTS could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine far in excess of a cigarette on a per puff basis and could have designed the device to shut off for a period of time if excessive puffs were taken too close in time.

307. The JUUL DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's identity and age verification, restricting those underage from using the JUUL Product, or other similar technology, or youth restricting features.

308. The JUUL DEFENDANTS defectively designed JUUL products that are inherently dangerous because they included features making the product attractive and more palatable to youth and non-smokers. These features include but are not limited to "party mode" lights; in youth appealing colors and flavors, a sleek virtually smoke free design capable of escaping detection by adults and school authorities. In addition, the JUUL DEFENDANTS increased the ease of inhalability of JUUL and the level of nicotine that is absorbed by users making the product even more addictive and dangerous.

309. The JUUL DEFENDANTS in conjunction with the E-LIQUID MANUFACTURING DEFENDANTS defectively designed JUULpods in youth appealing colors and flavors that are unsafe to inhale because the e-Liquid is dangerous and hazardous and includes

constituent flavoring additives and other chemicals that carry a significant risk of toxicity and injuries that the E-LIQUID MANUFACTURING DEFENDANTS failed to test as to the safety of the solutions they manufactured and sold for use in JUUL.

310. JUUL products do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect.

311. The risks inherent in the design of JUUL products significantly outweigh any benefits of such design.

312. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS could also have designed the products in a way in which they would not be as appealing to minors and non-smokers by designing the device with a throat hit and only designing non-flavored E-Liquids.

313. DENIS N. BYRNE, JR. used JUUL and related vaping products as intended or in reasonably foreseeable ways.

314. DENIS N. BYRNE, JR.'s injuries, physical, emotional and economic, and death were reasonably foreseeable to the DEFENDANTS at the time of the products' design, manufacture, distribution, and sale.

315. JUUL products were defective and unreasonably dangerous when they left the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS' possession. The defects continued to exist through the products' sale to and use by consumers, including DENIS N. BYRNE, JR., who used the products without any substantial change in the products' condition.

316. The RETAILER DEFENDANTS and DISTRIBUTOR DEFENDANTS are strictly liable for the sale of defective JUUL products and related vaping products they sold.

317.    DENIS N. BYRNE, JR. was injured as a direct and proximate result of JUUL's defective designs as described herein. The defective design of JUUL products was a substantial factor in causing DENIS N. BYRNE, JR.'s injuries, damages and death.

318.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
### Strict Liability - Failure to Warn

319.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

320.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL products that DENIS N. BYRNE, JR. consumed.

321.    JUUL products are sold in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn about the risk of nicotine addiction and failing to warn entirely of the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein.

322.    DEFENDANTS were aware that JUUL products posed risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL products.

323.    JUUL products are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers including DENIS N. BYRNE, JR., in JUUL's labeling, packaging and through the marketing, promotion and advertising of JUUL including that:

a.      prior to November 2017 that JUUL products contained nicotine;

b.     the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

c.     JUUL products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

d.     JUUL products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

e.     the representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

f.     JUUL was an e-cigarette intended not intended for persons under age 26;

g.     JUUL delivered more nicotine than cigarettes;

h.     JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i.     JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j.     which and when medical symptoms warranted medical care; and,

k.     how many JUULpods are safe to consume in a day.

324.    The JUUL DEFENDANTS affirmatively encouraged new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

325.    The E-LIQUID MANUFACTURING DEFENDANTS acknowledged no studies had been conducted to evaluate the safety of the flavoring additives and other E-Liquids chemicals when vaporized and inhaled as e-cigarettes and that these untested ingredients were contained within JUULpods; however, no such warnings of the lack of safety studies was provided to millions of consumers throughout the United States.

326. The failure of the DEFENDANTS to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of JUUL products.

327. Ordinary consumers would not have recognized the potential risks of JUUL products when used in a manner reasonably foreseeable to DEFENDANTS.

328. The RETAILER DEFENDANT and the DISTRIBUTOR DEFENDANTS are strictly liable for the sale of defective JUUL products and related vaping products they sold that contained inadequate warnings.

329. DENIS N. BYRNE, JR. could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by JUUL products.

330. The defects in JUUL products, including the lack of adequate warnings and instructions, existed at the time the products left the DEFENDANTS' possession and continued to exist through the products' sale to and use by consumers, including DENIS N. BYRNE, JR.. JUUL products were used without substantial change in their condition from the time of their manufacture or sale.

331. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sale, and on the product labels.

332. DENIS N. BYRNE, JR. was injured and died as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used or purchased JUUL products had he received adequate warnings and instructions that he could be harmed by higher-than-perceived nicotine exposure, develop an addiction and severe lung injury, be exposed to a panoply of harmful chemical additives in the flavorings and suffer other negative health consequences including but not limited to life threatening lung injuries, brain, behavioral, cognitive and mental health injuries.

333. JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the DENIS N. BYRNE, JR.'s injuries and death.

334. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
**Strict Liability – Manufacturing Defect**

335. Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

336. At all relevant times, the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL products that DENIS N. BYRNE, JR. consumed.

337. The JUUL DEFENDANTS contracted with the E-LIQUID MANUFACTURING DEFENDANTS to supply, manufacture, process and blend the E- liquids and flavoring following a "menu."

338. Employees of the E-LIQUID MANUFACTURING DEFENDANTS were inadequately trained and supervised, resulting in widely variable products with different concentrations of nicotine, some highly excessive and beyond the specifications.

339. Upon information and belief, the E-LIQUID MANUFACTURING DEFENDANTS supplied contaminated contents that were inserted in Pods which JLI sold to users, including teenagers and young adults, with reckless disregard for consumer safety.

340. When JUUL products left the control of the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS, they were expected to, and did reach DENIS N. BYRNE, JR. without substantial change from the condition in which they left the control of Defendants.

341.    DENIS N. BYRNE, JR. used JUUL products in substantially the same condition that they were in when they left the control of the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS and any changes or modifications were foreseeable by these Defendants.

342.    DENIS N. BYRNE, JR. used JUUL products in a manner intended and/or foreseeable to the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS.

343.    JUUL products contained manufacturing defects when they left the JUUL DEFENDANTS' and E-LIQUID MANUFACTURING DEFENDANTS' control and were placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

344.    Without limitation, examples of the JUUL DEFENDANTS' and E-LIQUID MANUFACTURING DEFENDANTS' inadequate manufacturing, assembling, inspecting and packaging practices include:

        a.    Failure to follow Good Manufacturing Practices ("GMPs");

        b.    Failure to adequately inspect/test JUUL products during the manufacturing process;

        c.    Failure to ensure that instruments used to prepare E-Liquids for JUULpods were properly cleaned and sterilized to ensure there was no cross contamination between products;

        d.    Failure to implement procedures that would measure and confirm the amount of nicotine in each JUULpod;

        e.    Failure to timely establish procedures or practices to prevent JUUL products from being contaminated on the production line or elsewhere at production facilities; and,

        f.    Failure to have sanitary conditions and protocol at the facilities to avoid contamination.

345.    The RETAILER DEFENDANTS and DISTRIBUTOR DEFENDANTS are strictly liable for the sale of defectively manufactured JUUL products and related vaping products they sold.

346.    DENIS N. BYRNE, JR. was injured as a direct and proximate result of the manufacturing, assembling, processing, blending, inspecting and packaging defects of JUUL products as described herein.

347.    The defective manufacturing, assembling, inspecting and packaging of JUUL products was a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death.

348.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
### Negligent Design

349.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

350.    At all relevant times, the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, processed, blended, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL products that DENIS N. BYRNE, JR. consumed.

351.    JUUL products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL's nicotine solutions.

352.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL products were dangerous, harmful and injurious when used by DENIS N. BYRNE, JR. in a reasonably foreseeable manner, particularly with minors and young adults.

353.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as DENIS N. BYRNE, JR. would not have realized the potential risks and dangers of JUUL products. JUUL products contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

354. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

355. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care in the design of JUUL products because the products delivered a high amount of nicotine, included other harmful ingredients, and had the likelihood of causing nicotine addiction and the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular, behavioral, cognitive and mental health injuries, among other harmful effects.

356. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS breached their duty by failing to use reasonable care in the design of JUUL products by negligently designing these products that created risks of abuse and addiction and could cause severe lung injuries.

357. A reasonable company under the same or similar circumstances would have designed a safer product.

358. The RETAILER DEFENDANTS and DISTRIBUTOR DEFENDANTS are strictly liable for the sale of defectively designed JUUL products and related vaping products they sold.

359. DENIS N. BYRNE, JR. was harmed directly and proximately by DEFENDANTS' failure to use reasonable care in the design of JUUL products. Such harm includes significant exposure to toxic substances, which can cause or contribute to significant physical injuries; nicotine addiction; emotional, psychiatric, psychological and economic harm.

360. The negligent design of JUUL products was a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death.

361. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### FIFTH CAUSE OF ACTION
### Negligent Failure to Warn

362.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

363.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL products that DENIS N. BYRNE, JR. consumed.

364.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL products was dangerous, harmful and injurious when used by DENIS N. BYRNE, JR. in a reasonably foreseeable manner, particularly with minors and young adults.

365.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as DENIS N. BYRNE, JR. would not have realized the potential risks and dangers of JUUL products. JUUL products contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

366.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL products.

367.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of JUUL products.

368.    The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in

JUUL's labeling and packaging and through marketing, promoting and advertising of JUUL including that:

a. prior to November 2017 that JUUL products contained nicotine;

b. the amount of nicotine contained in a JUULpod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

c. JUUL products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

d. JUUL products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

e. the representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

f. JUUL was an e-cigarette intended not intended for persons under age 26;

g. JUUL delivered more nicotine than cigarettes;

h. JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i. JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j. which and when medical symptoms warranted medical care;

k. how many JUUL Pods are safe to consume in a day; and,

l. urging customers to keep puffing even if they found the vapor harsh.

369. The E-LIQUID MANUFACTURING DEFENDANTS acknowledged no studies had been conducted to evaluate the safety of flavoring additives and flavored E-Liquids with e-cigarettes and that these untested ingredients were contained within JUULpods; however, no such warnings of the lack of safety studies was provided to millions of consumers throughout the United States.

370.    The failure of the DEFENDANTS to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of JUUL products.

371.    At all relevant times, the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sale, and on the product labels.

372.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

373.    The RETAILER DEFENDANTS and DISTRIBUTOR DEFENDANTS are strictly liable for the sale of defective JUUL products and related vaping products they sold that contained inadequate and improper warnings.

374.    DENIS N. BYRNE, JR. was harmed directly and proximately by the DEFENDANTS' failure to use reasonable care in providing adequate warnings with JUUL products. Such harm includes significant exposure to toxic substances, which can cause or contribute to significant physical injuries; nicotine addiction; emotional, psychiatric, psychological and economic harm.

375.    JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the DENIS N. BYRNE, JR.'s injuries and death.

376.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### Negligent Manufacturing

377.    Plaintiff incorporates the above and below allegations by reference.

378. At all relevant times, the JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL products that DENIS N. BYRNE, JR. consumed.

379. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS had a duty to use exercise reasonable care, in the manufacturing, assembling, inspecting and packaging of JUUL products.

380. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL products carelessly manufactured, assembled, inspected and packaged was dangerous, harmful and injurious when used by DENIS N. BYRNE, JR. in a reasonably foreseeable manner.

381. The JUUL DEFENDANTS and E-LIQUID MANUFACTURING DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as DENIS N. BYRNE, JR. would not have realized the potential risks and dangers of JUUL products improperly manufactured assembled, inspected and packaged.

382. The JUUL DEFENDANTS contracted with the E-LIQUID MANUFACTURING DEFENDANTS to supply, manufacture, process and blend the E- liquids and flavoring following specifications in a "menu."

383. Employees of the E-LIQUID MANUFACTURING DEFENDANTS were inadequately trained and supervised, resulting in widely variable products with different concentrations of nicotine, some highly excessive and beyond the specifications.

384. Upon information and belief, the E-LIQUID MANUFACTURING DEFENDANTS supplied contaminated contents that were inserted in Pods which JLI sold to users, including teenagers and young adults, with reckless disregard for consumer safety.

385. Without limitation, the JUUL DEFENDANTS' and E-LIQUID MANUFACTURING DEFENDANTS' breached their duty to exercise reasonable care in manufacturing, assembling, inspecting and packaging by:

a.  Failing to follow Good Manufacturing Practices ("GMPs");

b.  Failing to adequately inspect/test JUUL products during the manufacturing process;

c.  Failing to ensure that instruments used to prepare E-Liquids for JUULpods were properly cleaned and sterilized to ensure there was no cross contamination between products;

d.  Failing to implement procedures that would measure and confirm the amount of nicotine in each JUULpod:

e.  Failing to timely establish procedures or practices to prevent JUUL products from being contaminated on the production line or elsewhere at production facilities; and,

f.  Failing to have sanitary conditions and protocol at the facilities to avoid contamination.

386.  A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

387.  The RETAILER DEFENDANTS and DISTRIBUTOR DEFENDANTS are strictly liable for the sale of defectively manufactured JUUL products and related vaping products they sold.

388.  DENIS N. BYRNE, JR. was injured as a direct and proximate result of DEFENDANTS' failure to use reasonable care in the manufacturing, assembling, inspecting and packaging of JUUL products as described herein.

389.  The DEFENDANTS' negligent manufacturing, assembling, inspecting and packaging of JUUL products was a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death.

390.  Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### Negligence and/or Gross Negligence

391.  Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

Case 1:21-cv-09110-JPC   Document 1-1   Filed 11/03/21   Page 91 of 117

392.   At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

393.   JUUL products were the types of products that could endanger others if negligently made or promoted.

394.   DEFENDANTS had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing and/or selling JUUL products to avoid causing harm to those that consumed these products.

395.   DEFENDANTS knew, or should have known the exercise of reasonable care, the risks to consumers of JUUL, powerfully addictive and dangerous nicotine-delivery devices.

396.   DEFENDANTS knew, or should have known the exercise of reasonable care, that minors and young people would be attracted to these products.

397.   DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL products was dangerous, harmful and injurious when used by DENIS N. BYRNE, JR. in a reasonably foreseeable manner, particularly with minors and young adults.

398.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as DENIS N. BYRNE, JR. would not have realized the potential risks and dangers of JUUL products. JUUL products contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

399.   DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL products.

400.    DEFENDANTS knew or should have known that JUUL products needed to be researched, designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

401.    DEFENDANTS knew or should have known that its JUUL products could cause serious risk of harm, particularly to young persons and minors.

402.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to DENIS N. BYRNE, JR., thereby causing DENIS N. BYRNE, JR. to suffer harm.

403.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a.    Failure to perform adequate testing of the JUUL products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, pulmonary and immune systems, and other related medical conditions, as well as its effect on mental health;

b.    Failure to warn consumers that JUUL products had not been adequately tested or researched prior to marketing to ensure safety;

c.    Failure to take reasonable care in the design of JUUL products;

d.    Failure to use reasonable care in the production of JUUL products;

e.    Failure to use reasonable care in the manufacture of JUUL products;

f.    Failure to use reasonable care in the assembly of JUUL products;

g.    Failure of the DISTRIBUTOR DEFENDANTS to use reasonable care in supplying and distributing JUUL's products;

h.    Failure of the RETAILER DEFENDANTS to use reasonable care in the sale and promotion of JUUL products;

i.    Failure to use reasonable care in advertising, promoting, and marketing JUUL products;

j.    Failure to use reasonable care in the sale of JUUL products without adequate warnings; use of flavors and design to appeal to minors and young

people, in that the products smell good, look cool and are easy to conceal from parents and teachers;

k.     Use of a design that maximizes nicotine delivery while minimizing "harshness," thereby easily creating and sustaining addiction;

l.     Failure to utilize proper materials, ingredients, additives and components in the design of JUUL products to ensure they would not deliver unsafe doses of nicotine and cause other injuries from inhalation of other hazardous chemicals;

m.     Failure to inspect JUUL products for them to operate properly and avoid delivering unsafe levels of nicotine and causing the injuries described herein;

n.     Failure to reasonably and properly test and properly analyze the testing of JUUL products under reasonably foreseeable circumstances;

o.     Failure to warn consumers about the dangers associated with use of JUUL products, in that it was unsafe, significantly increases blood pressure, causes vascular and pulmonary damage, causes lung injuries, carries risks of stroke, heart attacks, and pulmonary and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition;

p.     Failure to warn consumers of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained with JUUL products;

q.     Failure to warn consumers of the actual nicotine content, JUUL products' cigarette equivalence and the pharmacokinetics of JUUL use;

r.     Misleadingly stating the amount of nicotine in JUULpods is "approximately equivalent to a pack of cigarettes", when the amount of nicotine contained in a JUULpod is as much as twice as high as that in a pack of cigarettes;

s.     Failure to provide any instructions regarding a safe amount of JUULpods to consume in a day;

t.     Failure to take necessary steps to modify JUUL products to avoid delivering high doses of nicotine and repeatedly exposing them to toxic chemicals;

u.     Failure to recall JUUL products;

v.     Failure to limit the number of purchases and ability to receive replacement devices from Juul on juul.com;

w.     Shipping JUUL products to retail locations with actual or constructive knowledge that retailers were not utilizing age verification procedures resulting in unlawful sales to minors; and,

x.     Defendants knew that use of JUUL caused users to vape other products including products containing THC.

y.  all other failures, acts and omissions set forth herein.

404.  DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to DENIS N. BYRNE, JR..

405.  DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of DENIS N. BYRNE, JR., and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to DENIS N. BYRNE, JR..

406.  Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try JUUL products and quickly become addicted to JUUL products, resulting in teenagers and young adults developing lifelong addictions. After placing unnecessarily massive amounts of nicotine into their products, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

407.  DENIS N. BYRNE, JR. was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes nicotine addiction with its behavioral and emotional sequelae, acute and chronic respiratory injuries, addiction, and significant exposure to toxic substances, which may cause or contribute to additional disease.

408.  DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to DENIS N. BYRNE, JR.'s injuries and death.

409.  Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
### Negligent Misrepresentation

410.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

411.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

412.    DEFENDANTS were negligent, reckless and careless and owed a duty to DENIS N. BYRNE, JR. to make accurate and truthful representations regarding JUUL products, DEFENDANTS breached their duty, thereby causing DENIS N. BYRNE, JR. to suffer harm.

413.    DEFENDANTS represented to DENIS N. BYRNE, JR. via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that:

        a.    JUUL products were safe, were safer than cigarettes and were not harmful;

        b.    That one JUULpod is "approximately equivalent to about 1 pack of cigarettes;"

        c.    An inaccurate and misleading portrayal of JUULpods nicotine content; and,

        d.    That the flavored Mango, Cool Cucumber and Crème Brulee were naturally flavored derived from such foods instead of labelling them as artificially flavored as they would be required to under food labelling rules.

414.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

415.    DEFENDANTS had a duty to accurately provide this information to DENIS N. BYRNE, JR.. In concealing this information from DENIS N. BYRNE, JR., DEFENDANTS breached their duty. DEFENDANTS also gained financially from, and as a result of their breach.

416.    DEFENDANTS intended for DENIS N. BYRNE, JR. to rely on these representations.

417.    Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by DENIS N. BYRNE, JR. as to whether to purchase or consume JUUL products.

418.    DEFENDANTS have yet to disclose correct these misrepresentations about JUUL products.

419.    DENIS N. BYRNE, JR. reasonably relied on these representations and was harmed as described herein. DENIS N. BYRNE, JR.'s reliance on DEFENDANTS' representations was a substantial factor in causing DENIS N. BYRNE, JR.'s harms. Had DEFENDANTS told DENIS N. BYRNE, JR. the truth about the safety and composition of JUUL products, DENIS N. BYRNE, JR. would not have consumed or purchased them.

420.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of DENIS N. BYRNE, JR.'s rights, interests, and well-being to enrich DEFENDANTS.

421.    DENIS N. BYRNE, JR. was injured and died as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding JUUL products as described herein. Such harm includes acute and chronic respiratory injuries, addiction, behavioral, cognitive and mental health injuries and significant exposure to toxic substances, which may cause or contribute to additional disease.

422.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### Fraud

423.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

424.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, processed, blended, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

425.    DEFENDANTS created and implemented a plan to generate a market for e-cigarettes and substantially increase sales of JUUL products through a pervasive pattern of false and misleading statements and omissions. DEFENDANTS' plan was intended to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, based in part on food flavors while misrepresenting or omitting key facts concerning nicotine content, addictiveness, flavoring content and safety.

426.    DEFENDANTS' marketing, promotions and advertisements contained deceptive statements that JUUL e-cigarettes were reasonable alternatives to combustible cigarettes.

427.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that JUUL e-cigarettes were not reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, and posed significant risks of substantial physical injury resulting from the use of the products.

428.    The labels and packaging of the JUUL products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products.

429.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JUUL's marketing, promotions and advertising its products as reasonable alternatives to cigarettes.

430.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the DENIS N. BYRNE, JR.. Reasonable consumers, including the DENIS N. BYRNE, JR., would have found it material to their purchasing decisions that JUUL products: (i) were not a reasonable alternative to cigarettes, (ii) were extremely potent

nicotine-delivery mechanisms, (iii) were flavored with artificial flavors, and (iv) posed unreasonable risks of substantial bodily injury including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in DENIS N. BYRNE, JR.'s decisions to purchase and consume JUUL products.

431.    Additionally, consumers including teenagers and are accustomed to seeing food products labelled with the term "artificial flavors" when the flavoring is not natural. 21 CFR Section 101.22, Subpart B--Specific Food Labeling Requirements governs food for human consumption and expressly requires that if a product's label makes a prominent representation with respect to a primary recognizable flavor, then that flavor is deemed to be a "characterizing flavor" and must be declared on the principle display panel (PDP). If the product contains any artificial flavor that simulates, resembles, or reinforces the characterizing flavor, the name of the food on the PDP must be accompanied by the name of the characterizing flavor with the words "artificial" or "artificially flavored."

432.    While JUULpods were not regulated as food, the use of food flavors in the marketing and packaging of these products was misleading. Marketing "Crème Brulee" JUUL with a picture next to coffee, suggesting it was a sweet dessert-like product (without the calories), and without referencing the fact the flavoring contained many artificial flavors and chemicals, misleadingly suggested to the consumer that the flavors were indeed natural. Similarly, the cucumber product did not contain cucumber and all of the flavorings were replete with artificial flavorings and chemicals.

433.    DEFENDANTS owed DENIS N. BYRNE, JR. a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be materials to reasonable consumers; because JUUL products pose an unreasonable risk of substantial bodily injury; and because JUUL made partial representations concerning the same subject matter as the omitted facts.

434.    DENIS N. BYRNE, JR. reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on JUUL's misrepresentations and omissions.

435.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

436.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death. DENIS N. BYRNE, JR. was injured and died as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

437.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
### Fraudulent Concealment

438.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

439.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

440.    DEFENDANTS had a duty to disclose material facts about JUUL products to DENIS N. BYRNE, JR..

441.    DEFENDANTS fraudulently and deceptively marketed JUUL products to DENIS N. BYRNE, JR. as safe, healthful, or not harmful, when DEFENDANTS knew it to be untrue.

442.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally. DEFENDANTS and others worked together to pitch news

stories or other media content designed to downplay the risks of e-cigarettes, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

443.    DEFENDANTS fraudulently and deceptively concealed that JUUL products can cause physical injuries such as seizures, acute and chronic respiratory injuries, heart attacks, strokes and other cardiovascular injuries, addiction, behavioral, cognitive and mental health injuries and significant exposure to toxic substances, which may cause or contribute to additional disease.

444.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested JUUL and the E-Liquids to assess its safety before placing it on the market and promoting it to young people and older adults.

445.    DEFENDANTS fraudulently and deceptively concealed JUUL were powerfully addictive and that its design inherently demanded dependency.

446.    DEFENDANTS further failed to disclose to DENIS N. BYRNE, JR. that JUUL are designed to create and sustain an addiction to nicotine. DEFENDANTS also manipulated the formulations of JUUL products in ways that could and would impact their potency and addictiveness, and DEFENDANTS did so without notifying DENIS N. BYRNE, JR..

447.    JUUL DEFENDANTS fraudulently concealed to users the amount of nicotine consumed by using JUUL. As previously explained, JUUL DEFENDANTS claim that one JUULpod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUULpod is actually equivalent to the amount of nicotine consumed through at least two packs of combustible cigarettes.

448.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by DENIS N. BYRNE, JR. as to whether to purchase or consume JUUL products.

449.     DENIS N. BYRNE, JR. did not know of the facts that DEFENDANTS concealed.

450.     DEFENDANTS intended to deceive DENIS N. BYRNE, JR. and the public by concealing these facts.

451.     DEFENDANTS had a duty to accurately provide this information to DENIS N. BYRNE, JR.. In concealing this information from DENIS N. BYRNE, JR., DEFENDANTS breached their duty. DEFENDANTS also gained financially from, and as a result of their breach.

452.     DEFENDANTS had ample opportunities to disclose these facts to DENIS N. BYRNE, JR., through packaging, advertising, retail outlets, on its website, and on social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about JUUL products.

453.     DENIS N. BYRNE, JR. relied to their detriment on DEFENDANTS' fraudulent omissions. Had DENIS N. BYRNE, JR. been adequately informed of the material facts concealed from them regarding the safety of JUUL, and not intentionally deceived by DEFENDANTS, they would not have purchased or used JUUL products.

454.     DEFENDANTS' fraudulent concealment was a substantial factor in DENIS N. BYRNE, JR.'s injuries and death as described herein, including addiction, and significant exposure to toxic substances, which may cause or contribute to additional disease. DENIS N. BYRNE, JR. was injured and died as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

455.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### ELEVENTH CAUSE OF ACTION
#### Unjust Enrichment

456.     Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

457.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

458.    DEFENDANTS created and implemented a plan to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. DEFENDANTS' plan was intended to portray JUUL products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, and safety.

459.    DEFENDANTS were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions and advertisements that included the following non-exhaustive list of omissions regarding: (i) whether JUUL products are reasonable alternatives to cigarettes, (ii) were extremely potent nicotine-delivery mechanisms, (iii) contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and (iv) posed unreasonable risks of substantial bodily injury resulting from the use of the products.

460.    DEFENDANTS requested and received a measurable benefit at the expense of DENIS N. BYRNE, JR. in the form of payment for JUUL products.

461.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits DENIS N. BYRNE, JR. conferred onto the Defendants at the DENIS N. BYRNE, JR.'s detriment. These benefits were the expected result of JUUL DEFENDANTS acting in their pecuniary interests at the expense of its customers.

462.    There is no justification for the DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

463.    DEFENDANTS wrongfully obfuscated the harm caused be their conduct. Thus, DENIS N. BYRNE, JR., who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using JUUL products would have on DENIS N. BYRNE, JR.'s health.

464.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff via the DENIS N. BYRNE, JR. to the position they occupied prior to dealing with. Due to the sprawling, decades-long tobacco litigations and other notice they have received as a result of lawsuits filed against them, DEFENDANTS are reasonably notified that DENIS N. BYRNE, JR. would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

465.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### TWELFH CAUSE OF ACTION
### Violation of Unfair Trade Practices/Consumer Protection Law
### N.Y. Gen. Bus Law §§ 349 et seq., §§ et seq.

466.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

467.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

468.    DENIS N. BYRNE, JR. purchased and/or used a JUUL products and suffered injuries as a result of DEFENDANTS' actions in violation of consumer protection laws.

469.  Had DEFENDANTS not engaged in the deceptive conduct described herein, DENIS N. BYRNE, JR. would not have purchased or used a JUUL products resulting in the monetary and physical injuries as alleged herein.

470.  Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include but are not limited to the following:

       a.     representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

       b.     advertising goods or service with the intent not to sell them as advertised; and

       c.     engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

471.  DENIS N. BYRNE, JR. was injured and died as a result of DEFENDANTS' unlawful conduct, which was intended to through a pervasive pattern of false and misleading statements and omissions by targeting minors and young adults portraying JUUL products as cool and safe alternatives to combustible cigarettes while misrepresenting or omitting concerns about their nicotine content, addictiveness, and safety.

472.  DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to DENIS N. BYRNE, JR. constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes.

473.  Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, manufacturers, advertisers, marketers, promoters and sellers of JUUL products, who are subject to liability under such legislation from fraudulent, unfair, deceptive, and unconscionable consumer sales practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were put on notice more than 30 days before this filing and failed to take any action to cure their actions or omissions.

474.    DENIS N. BYRNE, JR. relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to purchase and use JUUL products.

475.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff and DENIS N. BYRNE, JR. sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

476.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
**Breach of Express Warranty**

477.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

478.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR..

479.    DEFENDANTS expressly warranted through public statements, press releases advertisements, marketing materials and descriptions that JUUL products were safe for their intended use and that they were a safer alternative to traditional combustible cigarettes.

480.    DEFENDANTS expressly warranted to DENIS N. BYRNE, JR. through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, point-of-sale marketing and advertising, and its packaging materials that "JUUL pod contains ~.7 ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes."

Case 1:21-cv-09110-JPC Document 1-1 Filed 11/03/21 Page 106 of 117

481. DEFENDANTS expressly warranted to DENIS N. BYRNE, JR. through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, point-of-sale marketing and advertising and its packaging materials that "JUUL pod contains ~.7 ml with 3% nicotine by weight."

482. DEFENDANTS also expressly warranted that JUUL Pods are "5% Strength" as stated on the front of JUUL's product packaging and that one JUUL pod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials including point-of-sale marketing and advertising.

483. DEFENDANTS expressly warranted that JUUL use causes less, or at least no more, nicotine to enter the bloodstream than a cigarette and that one JUUL pod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials, including , point-of-sale marketing and advertising.

484. These affirmations of fact became the basis of the bargain between JUUL DEFENDANTS and DENIS N. BYRNE, JR., thereby creating express warranties that JUUL products would conform to JUUL's affirmations of fact, representations, promises, and descriptions.

485. As described herein, JUULpods actually contain more nicotine than as advertised, and JUUL delivers more nicotine per puff than a traditional cigarette and JUULpods contain significantly more nicotine than one pack of cigarettes.

486. These express communications contained misrepresentations and failed to warn of the serious and known risks of JUUL products as alleged herein.

487. When DEFENDANTS made these express warranties, they knew the intended purposes of the JUUL products and warranted the products to be, in all respects, safe and proper for such purposes.

488. DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The JUUL products sold by DEFENDANTS did not conform to these Defendants' promises,

descriptions or affirmations and were not adequately packaged, labeled, promoted and/or fit for the ordinary purposes for which they were intended.

489.    All of the aforementioned written materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by these Defendants and made part of the record once discovery is completed.

490.    DEFENDANTS' breach of these express warranties were a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death.

491.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff and DENIS N. BYRNE, JR. suffered serious economic and physical injuries and/or sequelae thereto as alleged herein.

492.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### FOURTEENTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**

493.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

494.    At all relevant times, the DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as DENIS N. BYRNE, JR.,

495.    The DEFENDANTS at all times were merchants with respect to JUUL products sold to DENIS N. BYRNE, JR. and were in the business of selling such products.

496.    Each JUUL product sold comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

497.   The ordinary intended purposes of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes or a smoking cessation device. For example, the "Make the Switch" campaign reinforces the impression that JUUL is linked to cessation and quitting and that JUUL is less harmful to one's health.

498.   JUUL products are not fit for that use—or any other use—because they arE unreasonably potent nicotine-delivery mechanisms, contain nicotine levels in contrast to their warranties, and pose significant risks of substantial physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, JUUL products worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction, JUUL products have served as a gateway to increased cigarette use.

499.   Due to these and other features, JUUL products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices and JUUL products are in fact defective and fail to conform to their implied warranties.

500.   The DEFENDANTS have breached JUUL's implied warranties of merchantability because JUUL products were not in merchantable condition when sold, were defective when sold, and do not possess even the most basic degree of fitness for ordinary use.

501.   Despite having received notice of these defects, the DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

502.   DENIS N. BYRNE, JR. had sufficient direct dealings with the JUUL DEFENDANTS via its website as well as the RETAILER DEFENDANTS as its agents authorized to sell and distribute JUUL products and to establish privity of contract between DENIS N. BYRNE, JR., the JUUL DEFENDANTS and the RETAILER DEFENDANT.

503.   Further, DENIS N. BYRNE, JR. was a third-party beneficiary of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL products to consumers. Specifically, DENIS N. BYRNE, JR. was the intended beneficiaries of JUUL's implied warranties. JUUL products are manufactured with the express purpose an intent of being sold to consumers.

504.   DENIS N. BYRNE, JR. would not have used or purchased JUUL products, or would not have purchased the products on the same terms, had he known the facts these Defendants failed to disclose.

505.   The DEFENDANTS' breach of these warranties were a substantial factor in causing DENIS N. BYRNE, JR.'s injuries and death.

506.   DENIS N. BYRNE, JR. was injured and died as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff and DENIS N. BYRNE, JR. were harmed by DEFENDANTS' failure to deliver merchantable products in the form of higher-than-perceived nicotine exposure, addiction, and other negative health consequences.

507.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

### FIFTEENTH CAUSE OF ACTION

Wrongful Death

506. Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

507.   The foregoing negligent and culpable acts of the DEFENDANTS were a proximate cause of the injuries suffered by DENIS N. BYRNE, JR., and caused his death on October 4, 2019.

508.   DENIS N. BYRNE, JR., left surviving him family members and distributees who have suffered pecuniary and other damages as a result of the death of DENIS N. BYRNE, JR, under the laws of the State of New York.

509.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, pecuniary and punitive damages, together with interest, costs of suit, attorneys' fees if permitted by law, and all such other relief as the Court deems proper.

## VI.     EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

510.    Plaintiff incorporates by reference all of the prior paragraphs of this Complaint as if fully set forth herein.

511.    Plaintiff has filed this lawsuit within the applicable limitations period of first suspecting that the JUUL products were the cause of any appreciable harm sustained by DENIS N. BYRNE, JR., within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries, within the applicable limitations period of first suffering an injury caused by Defendants' conduct and have otherwise filed this lawsuit within the limitations period for personal injury and wrongful death actions as provided for by New York State law. Neither Plaintiff nor DENIS N. BYRNE, JR. could have discovered, by the exercise of reasonable diligence, any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known. Plaintiff and DENIS N. BYRNE, JR. did not suspect, nor did they have reason to suspect, that wrongdoing had caused the injuries until recently.

512.    Plaintiff and DENIS N. BYRNE, JR. had no knowledge of the defects in the JUUL products or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiff or DENIS N. BYRNE, JR. have access to information regarding other injuries and complaints in the possession of Defendants. Additionally, Plaintiff and DENIS N. BYRNE, JR. were prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the JUUL products are safe, and Defendants fraudulently concealed information to allow Plaintiff and DENIS N. BYRNE, JR. to discover a potential cause of action sooner.

513.   Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and DENIS N. BYRNE, JR. the true risks associated with consuming JUUL products.

514.   As a result of Defendants' actions, Plaintiff and DENIS N. BYRNE, JR. were unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that DENIS N. BYRNE, JR. has been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

515.   Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of JUUL products.  Defendants were under a duty to disclose the true character, quality and nature of the JUUL products because this was non-public information over which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to Plaintiff and DENIS N. BYRNE, JR..

516.   Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable JUUL products, notwithstanding the known or reasonably known risks. Plaintiff and DENIS N. BYRNE, JR. could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and was forced to rely on Defendants' representations.

517.   **In representations to the DENIS N. BYRNE, JR. and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:**

a.   that JUUL products delivered excessive doses of nicotine, significantly increase blood pressure, cause lung injuries, addiction, permanent brain changes, mood disorders, strokes, heart attacks, and other cardiovascular injuries, and

b.   that the JUUL products were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

518.   Defendants were under a duty to disclose to Plaintiff and DENIS N. BYRNE, JR., and the public in general, the defective nature of the JUUL products.

519.   Defendants made the misrepresentations and actively concealed information concerning the unsafe, dangerous, and harmful nature of the JUUL products with the intention and specific desire to induce the consumers, including Plaintiff and DENIS N. BYRNE, JR., to rely on such misrepresentations in selecting, purchasing and using the JUUL products.

520.   Defendants made these misrepresentations and actively concealed information concerning the unsafe, dangerous, and harmful nature of the JUUL products in the labeling, advertising, promotional material or other marketing efforts.

521.   These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

522.   The misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, its sales representatives, employees, distributors, agents, marketers and those with whom it worked in concert to design, develop, market and distribute JUUL products.

523.   At the time the misrepresentations were made, DENIS N. BYRNE, JR. did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the JUUL products. Plaintiff and DENIS N. BYRNE, JR. did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff and DENIS N. BYRNE, JR. discover the false representations of Defendants, nor would Plaintiff or DENIS N. BYRNE, JR. with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

524.   Defendants knew that DENIS N. BYRNE, JR., and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the JUUL products, as set forth herein.

525. Had Plaintiff and DENIS N. BYRNE, JR. known the true facts about the dangers and serious health and/or safety risks of the JUUL products, DENIS N. BYRNE, JR. would not have purchased, used, or relied on Defendants' JUUL products.

526. Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, including DENIS N. BYRNE, JR..

527. The information distributed to the public and DENIS N. BYRNE, JR. by Defendants included, but was not limited to advertising campaigns, television commercials, print advertisements, billboards, social media posts, the use of social media personalities as promoters, and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the JUUL products.

528. Defendants intentionally made material misrepresentations to the public, including DENIS N. BYRNE, JR., regarding the safety of the JUUL products specifically that the JUUL products did not have dangerous and/or serious adverse health safety concerns, and that the JUUL products were safe for consumption by young adults.

529. Defendants' intent and purpose in making these misrepresentations was to deceive the DENIS N. BYRNE, JR.; to gain the confidence of the public and DENIS N. BYRNE, JR., to falsely assure them of the quality and fitness for use of the JUUL products; induce DENIS N. BYRNE, JR. and the public to use the JUUL products; and to avoid litigation and liability.

530. Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the JUUL products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

531. The misrepresentations and active concealment by Defendants constitute a continuing tort. Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the JUUL products.

532. As a result of the Defendants' advertising and marketing efforts, misrepresentations and omissions, the JUUL products are and continue to be pervasively manufactured and used in New York and throughout the United States.

533. The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff and DENIS N. BYRNE, JR. and other users of the JUUL products and for the primary purpose of increasing Defendant's profits from the sale and distribution of the JUUL products. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

534. Prior to the manufacturing, sale and distribution of the JUUL products, Defendants, and each of them, knew that the JUUL products were dangerous and unsafe when used as intended as previously alleged herein and knew that those who consumed the JUUL products would experience and did experience severe injuries, such as those experienced by DENIS N. BYRNE, JR.. Further, Defendants and each of them through its officers, directors, managers, and agents, had knowledge that the JUUL products presented a substantial and unreasonable risk of harm to the public, including DENIS N. BYRNE, JR. and, as such, consumers of the JUUL products were unreasonably subjected to risk of injury.

535. Despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known defects in the JUUL products and failed to warn the public, including the DENIS N. BYRNE, JR., of the extreme risk of injury inherent in the JUUL products. Defendants and its individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the JUUL products knowing that the public, including DENIS N. BYRNE, JR., would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

536.     Defendants' conduct was willful, wanton, despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiff and DENIS N. BYRNE, JR. to exemplary damages.

537.     Plaintiff has reviewed the potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state law.   Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.   DENIS N. BYRNE, JR. chooses to only pursue claims based on state law and are not making any claims that raise federal questions.

**WHEREFORE,** Plaintiff DENIS N. BYRNE, SR., demands judgment against each Defendant on each cause of action as follows:

A.     Awarding compensatory damages for the injuries suffered by DENIS N. BYRNE, JR., in an amount to be proved at trial, but in any event in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction;

B.     Awarding damages for the wrongful death of DENIS N. BYRNE, JR., in an amount to be proved at trial, but in any event in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction;

C.     Awarding punitive damages to the extent permitted by law;

D.     Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

E.     Awarding prejudgment interest to the extent permitted by law;

F.     Awarding such other and further relief as to this Court may seem just and proper.

**DENIS N. BYRNE, SR. DEMANDS A TRIAL BY JURY ON ALL ISSUES**

Case 1:21-cv-09110-JPC   Document 1-1   Filed 11/03/21   Page 116 of 117

Dated: September 28, 2021
       New York, New York

Respectfully Submitted,

THOMAS P. VALET
RAPPAPORT, GLASS, LEVINE & ZULLO LLP
**Attorneys for DENIS N. BYRNE, SR.**
1355 Motor Parkway
Islandia, NY 11749
(631) 293-2300
TValet@Rapplaw.com

## ATTORNEY VERIFICATION

THOMAS P. VALET, affirms under penalties of perjury and pursuant to CPLR 2106:

That affirmant is the attorney for the plaintiff(s) in the action within; that affirmant has read the foregoing Summons and Complaint and knows the contents thereof; that the same is true to affirmant's own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters affirmant believes it to be true and the reason that this verification is not made by plaintiff and is made by affirmant is that plaintiff is not presently in the county where the attorneys for the plaintiff has his office.

Affirmant further says that the source of affirmant's information and the grounds of affirmant's belief as to all matters not stated upon affirmant's knowledge are from investigations made on behalf of said plaintiff.

Dated:        September 28, 2021
              Islandia, New York


                                              _____
                                              THOMAS P. VALET